## UNITED STATES v. COLE et al.
### No. 20794–Cr.

United States District Court
S. D. California, Central Division.
April 18, 1950.

148

On July 20, 1949, an indictment was returned in the United States District Court for the Southern District of California, Central Division, charging William F. Cole and Paula C. Lubic with income and estate tax evasion.

On February 10, 1950, a Bill of Particulars was furnished by the Government setting forth in greater detail than in the indictment, the items which the Government contended should have been reported as a part of the estate of B. Brasley Cohen, deceased, of which the defendants William F. Cole and Paula C. Lubic were joint administrators, and which were not included in the returns filed by them in that capacity.

On a plea of not guilty, the trial of the cause began on April 11, 1950. In what follows is given a summary of the pleadings and the evidence offered on the part of the Government.[1]

While the indictment is in two counts, the principal count is Count 2, which charges a violation of the estate tax law, Section 894(b) (2) (C) of Title 26 of the United States Code Annotated. In it it is charged that Paula C. Lubic and William F. Cole, who were joint administrators of the estate of their mother, Bessie Brasley Cohen, deceased, did file a false

estate tax return willfully and knowingly, in which they failed to list certain assets of the estate. The Government contended that these assets were the property of Mrs. Cohen at the time of her death, became the property of her estate, and, as such, should have been included in the estate tax return.

More particularly, it was contended, in connection with Count 2 of the indictment, that, at the time of Mrs. Cohen's death, she owned,—among other things which were listed in the return,—2,000 shares of the common stock of the Brasley-Cole Shoe Company,—stock which had been issued in the names of other persons, Mr. R. S. Long and Paula C. Lubic, one of the defendants, but had been endorsed in blank and was found in her safety deposit box. The valuation of that stock was approximately $84.-50 per share, which was the valuation which the defendants themselves placed upon the stock in connection with other similar stock owned by Mrs. Cohen.

The Government also contended that, at the time of her death, Mrs. Cohen owned 780 shares of the stock of Gross & Kabaker, Inc., which was valued at approximately $142.00 per share,—a total of 111,-000 odd dollars, and that this was not listed upon the estate tax return.

These shares of stock were held in the names of Paula Lubic and R. S. Long, and, in one instance, of a Charles Kabaker. But the Government asserted that the stock had been under the deceased's complete dominion and control for a number of years, and that she was, in truth, its owner.

At the time of Mrs. Cohen's death, Brasley-Cole Shoe Company was indebted to her on the books of that company, in the amount of approximately $29,245.00. Shortly after her death, this account was charged off and was credited to the account of Ben Paul Brasley, a brother of Mrs. Cohen, and, as such, it was not reported in the estate tax return of Mrs. Cohen, but was subsequently paid out to the defendants and the immediate families in

1. With few changes, the summary is in the language of the opening statement, made on behalf of the government by George E. Danielson, Esq.

small checks. Brasley testified that the Company did not owe him any money.

Count 1 of the indictment charged the violation of Section 145(b) of Title 26 U.S.C.A., in that the two defendants as the administrators of the estate of their mother, Mrs. Cohen, failed to report certain income of the estate, i. e., the amount of approximately $15,360.00, which was the 1942 dividend on the stock, which the Government asserted to be an asset of the Cohen estate not reported on the estate tax return. Otherwise put, the 2,000 shares of Brasley-Cole were not listed in the estate tax return which received a dividend in 1942. If the stock was the property of Mrs. Cohen, the dividend was also the property of her estate. Count 1 is thus dependent upon Count 2.

In sum, the income alleged in Count 1 as not having been reported is income derived in 1942 from the stocks which were not reported in connection with the estate tax return.

The evidence showed that Mrs. Cohen was a very capable business woman. In 1929, she came to California. She had been in the shoe business for a long time, owning retail shoe stores, and she organized the Brasley Shoe Company. In early November of 1929, 4,000 shares of the stock of the Brasley Shoe Company were issued to her,—certificates Nos. 1, 2, 3, and 4, of 1,000 shares each. A few weeks later she had the last two certificates, numbered 3 and 4, canceled, and two new certificates, 5 and 6, for 1,000 shares each issued to a business associate, Leon Kreiger, thereby transferring one-half of her stock to him. A few week later, the name of the company was changed to the Brasley-Kreiger Shoe Company, and the business went along apparently quite successfully.

In July of 1936, Mrs. Cohen entered into a contract with Mr. Kreiger, an agreement whereby she bought out his 2,000 shares of stock for $125,000.00. That was roughly $62.50 per share. She gave him a check for $125,000.00, and the certificates which had been issued to him, Nos. 5 and 6, were subsequently turned into the corporation and canceled.

In September of 1936, there was a stockholders' meeting of the Brasley-Kreiger Shoe Company, in which it was decided to change the name again from Brasley-Kreiger to Brasley-Cole Shoe Company. At that time, Mrs. Cohen appears in the Minutes of the corporation as being the sole stockholder of all 4,000 shares of the outstanding stock of the Brasley-Kreiger Shoe Company. Since she was the only one who voted, the company name was changed to Brasley-Cole Shoe Company.

In October, 1936, two undated letters were submitted by Mrs. Cohen to the Brasley Shoe Company, in which she said that she was turning in certificates 5 and 6, which had been issued to Mr. Kreiger, and that she requested that two new certificates of 1,000 shares each be issued, one of them to Mr. R. S. Long and the other in the name of her daughter, Paula Lubic. Those two certificates, Nos. 7 and 8 for 1,000 shares each, constitute the 2,000 shares of stock which the Government contended were the property of Mrs. Cohen at the time of her death in 1942, which became the property of her estate, and which should have been included in the estate tax return.

In December, 1936, a dividend was paid on this Brasley-Cole Shoe Company stock, for which dividend checks were issued. One of the checks went to Mrs. Lubic for the proportionate share of one-fourth of the dividend of 1,000 shares of stock, or something over $8,800.00. Another dividend went to Mr. Long for $8,875.00.

The checks were signed by Mrs. Cole. Mrs. Lubic's check was endorsed for deposit and deposited in a bank in Pittsburgh, Pennsylvania. Long's check was deposited in a local branch of the Bank of America.

On January 12, 1937, two weeks later, Long's account in the Bank of America was charged with $8,000.00. To understand Long's position in these transactions, certain other facts must be stated.

Mrs. Cohen had other business interests. She was interested in a business known as Gross & Kabaker, a partnership in the shoe business. In August 1935, Gross & Kabaker, a partnership, was incorporated

under the laws of the State of California, 110 shares of stock being issued to Mr. Gross and 110 shares to Mr. Kabaker. Their assets in the partnership were charged accordingly.

Mrs. Cohen had loaned money to this partnership. At that time, there appeared on the books of the Company evidence that they owed her over $20,000.00. So 110 shares of stock were also issued to R. S. Long, and Mrs. Cohen's account was charged with the price of that stock, $11,-000.00. About three weeks later, again 110 shares of the stock were issued, this time to Charles Kabaker, and again Mrs. Cohen's account with the Company was charged in the amount of $11,000.00.

During the period from August of 1935 until June of 1936, Mrs. Cohen continued to lend the new corporation money, and, as of March 30, 1936, the corporation's records show that the corporation owed her about $48,000.00.

The Board of Directors met, decided to issue some more stock, and they applied to the State Corporation Commission and received a permit to issue the as yet unissued 560 shares of stock in the corporation at par value to Mrs. Lubic for a cash sale. The permit was granted. On June 6, 1936, Mrs. Cohen's account was debited with $56,000.00, and capital stock was credited with $56,000.00. 560 shares of stock were issued in the name of Mrs. Lubic in four certificates. Those are certificates 5, 6, 7 and 8 for 140 shares each. These certificates are part of the stock which the Government claimed Mrs. Cohen owned at the time of her death, and which should have been listed in her estate tax return.

In December, 1936, Gross & Kabaker also declared a dividend. A check was issued to Paula C. Lubic for the dividend which would pertain to 760 shares, although 560 shares were in her name, and this check, in the amount of $14,440.00, together with the check from Brasley-Cole Shoe Company for $8,750.00 were deposited, together with a check of $600.00, as an allowance from her mother, in her account in Pittsburgh, Pennsylvania, on January 11, 1937. On January 20, 1937, Mrs. Cohen's account in Los Angeles was credited with $22,300.00, practically, the Government claimed, the amount of the dividend issued to Mrs. Lubic.

In 1937, another dividend was paid in connection with the Brasley-Cole Shoe Company.

On August 1, 1941, there were placed upon the stubs for certificates 7 and 8 of the Brasley-Cole Shoe stock in the books of the corporation, Internal Revenue documentary stamps for the transfer of stock.

In 1941, there was again declared a dividend on the stock of the Brasley-Cole Shoe Corporation.

On May 16, 1942, Mrs. Cohen died. On May 20, 1942, in accordance with the laws of the State of California, representatives of the estate, of the Bank in which she had her safety deposit box and the Los Angeles County Treasurer's Office opened her box, and in it found stock certificates in the Brasley-Cole Shoe Company in the amount of 1,000 shares issued to Long and Lubic and endorsed in blank. In her box also were certificates 3, 4, 5, 6, 7 and 8 of Gross and Kabaker, Inc., the first two certificates being the ones issued to Mr. Gross and Mr. Kabaker when the company was organized in 1935, and paid for by charging her account in the amount of $11,000.00 in each instance, and the latter four certificates totaling 560 shares being the certificates issued in 1936, at the time the account owed to her by Gross & Kabaker was charged with $56,000.00, and the capital stock was credited with $56,000.00 for the issuance of the same shares.

Other facts will appear in the opinion to follow.

At the conclusion of the Government's case, each of the defendants moved for a judgment of acquittal upon the ground that the evidence was not sufficient to sustain a conviction of the offenses charged in the indictment. The defendants also moved to strike a good portion of documentary evidence introduced by the Government.

Ernest A. Tolin, Acting U. S. Attorney, Los Angeles, Cal., by Walter M. Campbell, Regional Counsel, Bureau of Internal Rev-

enue, and Special Assistant to the United States Attorney, San Francisco, Cal., and Ernest R. Mortenson, Penal Division Treasury Department of the United States, Washington, D. C., and George E. Danielson, Assistant United States Attorney, Los Angeles, Cal., for the plaintiff.

A. Calder Mackay, William Strong, F. Edward Little, Los Angeles, Cal., for the defendants.

YANKWICH, District Judge (ruling on motions, after stating the facts above):

The indictment is in two counts. The first count is based on Section 145(b), the second on Section 894(b) (2) (C) of Title 26 U.S.C.A.

Section 145(b) reads: "Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, * * *" shall be guilty of an offense.

Section 894(b) (2) (C) reads: "Any person required under this subchapter to collect, account for and pay over any tax imposed by this subchapter, who willfully fails to collect or truthfuly account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this subchapter or the payment thereof" shall, in addition to other penalties, be guilty of an offense.

The first count of the indictment recites that the defendants, as joint administrators of the estate of B. Brasley Cohen, did willfully, knowingly, unlawfully and feloniously, attempt to defeat and evade a large part of the income tax due and owing by the estate of B. Brasley Cohen, by filing with the Collector of Internal Revenue for the Sixth Collection District of California a false and fraudulent fiduciary income tax return of the estate of B. Brasley Cohen, deceased, for the period of May 16, 1942, to December 31, 1942, showing the income to be $27,213.65, when, in truth and in fact, the income was $42,573.65.

The second count alleges that, in an effort to defeat and evade a large part of the estate tax due and owing to the United States Government, the defendants filed false and fraudulent estate tax returns wherein they alleged that the net estate was the sum of $514,426.97, when, in truth and in fact, it was $820,595.70.

By the Bill of Particulars, which the Court ordered the Government to file, the details as to these items were given. It is quite evident that the "head and front" of the offense is contained in the second count wherein it is charged that the defendants, as executors, failed to report certain stocks which the Government claims were owned by the estate and should have been reported.

Under the first count, the allegations relate to the dividends received on the stock which the Government asserts belonged to the estate. That assertion is based upon the claim of the Government that the stocks described in the Bill of Particulars,— namely, 2,000 shares of stock of Brasley-Cole Shoe Company, 780 shares of stock of Gross and Kabaker, and the accounts receivable of the decedent in the amount of $29,245.87 belonged to the estate. The basic charge stems from the alleged concealment of, and fraudulent failure to report, the stock, and if that stands, then the first count stands with it. If that falls, the first count falls with it.

## I Amount of Tax Involved

The concealment of the account receivable in the sum of $29,245.87 is, in the light of the evidence in this case, of minor importance. And I doubt if the Government would have instituted this prosecution if all that had confronted them had been a failure to report this sum of money for which the tax would not have been very large.

However, on motions of this character, if the evidence in the case is sufficient to go to the jury on the question of concealment of this account receivable, the motion to strike the testimony would have to be denied as to that item, and the motion to acquit would have to be denied as to count 2. For it is a fundamental principle

of law that so long as there is a failure to report a tax, it is not material that the Government's testimony does not establish the exact amount of the tax which is charged in the indictment to have been concealed.

In one of the leading cases interpreting Section 145(b), United States v. Johnson, 1943, 319 U.S. 503, 517-518, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546, the Supreme Court said: "Of course the government did not have to prove the exact amounts of unreported income by Johnson. To require more or more meticulous proof than this record discloses that there were unreported profits from an elaborately concealed illegal business, would be tantamount to holding that skillful concealment is an invincible barrier to proof."

The same principle is stated in Himmelfarb v. United States, 9 Cir., 1949, 175 F. 2d 924, 940: "Unless extraordinary circumstances indicated otherwise, and there are none shown, the larger part thereof accrued during the calendar year of 1944. It is argued that there is no evidence to support a case showing appellant had as income in 1944 substantially the amount alleged in the indictment, and therefore he should be acquitted. The evidence in this case is sufficient to support the verdict and as stated in Maxfield v. United States, 9 Cir., 152 F.2d 593, 597, supra, 'Naturally, the prosecution was not required to prove the exact amounts of unreported income as alleged in the bill.' We are satisfied from a consideration of the whole record, that the evidence sustains the charge."

## II The Criteria of Proof

While the two sections under which the indictment is drawn relate to different obligations, in essence, they are the same, and are governed by the same criteria of proof. The cases interpreting Section 145(b) begin with Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418. Despite the positive wording of the section, the Government had contended in that case that they could turn an ordinary failure to make a return or to act as required by law into a fraudulent concealment.

The Government endeavored to turn an ordinary failure to return a tax into a fraudulent evasion by insisting that the facts were so flagrant that there was absolute proof of willfulness. The defendant was convicted. On certiorari, the Supreme Court held that this section and the kindred sections cover not mere failure to act as required by law,—but refer to attempts to defeat the purpose of the Act by *fraudulently concealing* matter which should go into returns, or by fraudulently failing to report income or property which, if reported, would result in a tax. The Court, in discussing the difference between the offense denounced by Section 145(b) and that covered by Section 145(a),—which deals with mere failure to return a tax, said:

"The difference between the two offenses, it seems to us, is found in the affirmative action implied from the term 'attempt' as used in the felony subsection. It is not necessary to involve this subject with the complexities of the common-law 'attempt'. The attempt made criminal by this statute does not consist of conduct that would culminate in a more serious crime but for some impossibility of completion or interruption or frustration. This is an independent crime, complete in its most serious form when the attempt is complete and nothing is added to its criminality by success or consummation, as would be the case, say, of attempted murder. Although the attempt succeeds in evading tax, there is no criminal offense of that kind, and the prosecution can be only for the attempt. We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues, Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony.

"Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation.

Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner'.

"By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." 317 U.S. at pages 498-499, 63 S. Ct. at page 368.

In brief, the Court tells us that when the Congress spoke of "willful" acts, they had in mind acts of the type which by common knowledge are done to "conceal".

If the facts are such as would have the effect of "revealing",—to use the antonym of "conceal",—we are not in the domain covered by this section. All the cases decided since this decision was rendered had some of the elements of fraudulent concealment, to which the Court referred.

An interesting one from the Ninth Circuit is Maxfield v. United States, 1945, 152 F.2d 593. After referring to the principle already alluded to,—that it is not incumbent upon the Government to prove the exact amount of the tax avoided,—and citing the Johnson case, the Court said:

"We are asked to hold that there is no evidence of willful intent to evade the tax, it being claimed that the showing does not measure up to the standards set in Spies v. United States, [1943], 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

"There is competent testimony in the record to the effect that appellants planned to keep two sets of books—one for exhibition purposes only; that they anticipated the receipt of a large income from sales of stock and desired to keep their taxes at a minimum; and there are admissions by appellants of substantial taxable profits never reported. There is, in addition, competent evidence that they failed to maintain adequate records, the only books kept being a cash journal derived from check stubs, bank statements, and deposit slips. In 1933, large sums of money were not put through any bank account. There were admissions of failure to keep records of property received in exchange for mining stock. On this phase the government auditor testified that nothing in appellant's books indicated that they owned any property. In order to obtain a complete record of appellants' transactions in Chiquita stock the auditor was compelled to use the stock register of the Chiquita Company in addition to the books of the parties themselves. There are other circumstances to be found in the record, including the evasiveness on cross-examination, particularly of Maxfield, from which bad faith was inferable.

"We are satisfied that the evidence of willful intent was sufficient to carry the case to the jury. The question of willfulness is one of fact, * * * and direct proof of wrongful intent is not necessary to establish guilt in cases of this character." 152 F.2d at page 597.

Another case which followed the Spies case is Rick v. United States, 1947, 82 U.S.App.D.C. 101, 161 F.2d 897, 898, where the Court used language which is very pertinent to the issue before us: "Under well-established principles of law, 'fraudulent' includes an intent and involves a subject matter of which someone is to be deprived. The same principles have been carried into income tax law. Thus, we are unable to find any real difference between a 'fraudulent' return and a willful attempt to evade a tax. A 'false' return may be merely incorrect, due to negligence or some other cause lacking intent or not involving a tax, and thus such a return is not necessarily willful or an attempt to evade a tax. The making of a 'false' return might, therefore, logically be subjected to a punishment different from that imposed upon a willful attempt to evade the tax."

In Battjes v. United States, 6 Cir., 1949, 172 F.2d 1, 4, the Court uses this language to distinguish between an *incorrect* return and one which is *fraudulent:* "We agree with appellant that there is a distinction between an erroneous tax return and one which is fraudulent, and that an actual bona fide misconception of the law, regardless of the presumption that the taxpayer knows the law, will not result in criminal liability under the statute referred to. Under that statute a willful purpose to evade the tax is necessary." In that case, the evidence showed concealment of real estate transactions and of income from gravel sold, and the like.

In the Himmelfarb case, supra, the evidence similarly showed failure to keep proper accounts, instructions to bookkeepers which, in themselves, showed a fraudulent intent to conceal and other acts of similar character.

In Myres v. United States, 8 Cir., 1949, 174 F.2d 329, the evidence also showed *positive* acts of concealment and claims of deductions which were palpably fraudulent. The Court, in that case, used language which is very pertinent here: "In the case of Cave v. United States, supra, this court said, page 467 of 159 F.2d [464] ' * * * The crime denounced by § 145(b) of willfully attempting to defeat or evade the tax is *complete when the taxpayer willfully and knowingly files* a false and fraudulent return with intent to defeat or evade any part of the tax due the United States." 174 F.2d at page 334. (Emphasis added)

■■ By the same token, if the criminal act is not committed at that time, we cannot take a subsequent act and retroject it to the time of the filing and charge it as criminal. If a criminal act is established as of a definite date, a criminal or fraudulent act committed later may bear upon the intent and is admissible. But we cannot base criminality *solely* upon something that was done after the return had been made, unless it is of a character to show conclusively the existence of the criminal purpose at the earlier date. See, United States v. Renee Ice Cream Co., 3 Cir., 1947, 160 F.2d 353, 357.

### III The Rule Governing Motions For Acquittal

The cases just discussed lay down the principles of law which control prosecutions under this section. They must govern the ruling on both motions. But before they are applied to the facts in this case, reference should be made to the rules governing *the motion for acquittal,* which takes the place of the former motion for directed verdict.

Rule 29(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., states that "the court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

Courts are not agreed as to the criteria which determine whether evidence is or is not sufficient to go to the jury. Some of them have held that the doctrine of reasonable doubt is so binding on the trial court that if the evidence is such that a reasonable doubt *could* arise in the minds of the jurors, the duty of the court is to take the case from the jury.

■ I am inclined to adopt, for the purposes of this case, the view of the Court of Appeals for the District of Columbia in Curley v. United States, 1945, 81 U.S.App. D.C. 389, 160 F.2d 229. Judge Prettyman, who writes the opinion, states the court's disapproval of the view just mentioned as too broad as statement of the law. He sums up what they consider to be the proper rule in these words: "The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt be-

yond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. In a given case, particularly one of circumstantial evidence, that determination may depend upon the difference between pure speculation and legitimate inference from proven facts. The task of the judge in such case is not easy, for the rule of reason is frequently difficult to apply, but we know of no way to avoid that difficulty." 81 U.S.App.D.C. at page 389, 160 F.2d at page 232.

## IV The Facts Proved

In applying the principles just discussed to the facts in the case, it is important to note that there is no oral testimony of an inculpatory nature bearing upon the acts or intent of the defendants in the form of statements or admissions made either at the time of the transaction, or subsequent conversations with members of the Federal Bureau of Investigation or of the Bureau of Internal Revenue. Unlike most cases of this type,—the entire record made by the Government consists of documentary evidence from which the Government would make certain inferences. There must, therefore, be eliminated from the consideration of this case the impressions which jurors might derive from hearing living witnesses. For there are none.[2] We are almost in the same position in which an appellate court finds itself when a case is tried on depositions or on documentary evidence. The documentary evidence being before the Court, it can draw the same inferences as the trier of facts. Consequently, the question before us is: What inference can a reasonable person derive from the undisputed documentary facts? That certain stocks, which are the basis of this indictment, were actually transferred six years before the death of Mrs. Cohen, to one of the defendants in the case, Mrs. Lubic. The transfer was made upon the books of the corporation. California Corporations Code, Secs. 2400–2401. The consideration was paid, not by the transferee, but by the mother of the transferee, who was the controlling head of the enterprise. California Corporations Code, Sec. 1109.

In every one of these cases, we have to consider what the Germans express by the word, the *gestalt*.[3] "Gestalt", as used in psychology or philosophy means that in considering a situation we must take into consideration everything which bears upon it, both objective and subjective.

In judging the matter before us, we must bear in mind the relation of the parties. This is not an ordinary business relationship. I believe that the entire difficulty in this matter arises from the fact that the Government accountants have overlooked this fact. They have forgotten that they are dealing, not with an ordinary corporation, but with a corporation controlled by the members of a single family, and that their actions must be interpreted in that light. Members of a family dealing with one another disregard often ordinary rules of business. And many actions which may look suspicious in dealings between strangers, lose all ominous significance when we are concerned with a closely-controlled family corporation.

So the fact that the consideration for the shares was paid by the mother, through her forgiving the corporation a portion of a debt equal to the value of the stock,—which amount was entered on the books of the corporation as cash,—does not deter from the validity of the transfer.

Corporations may issue shares in consideration of "debts and securities canceled". California Corporations Code, Sec. 1109(d). And a gift of personal property may be made without consideration. California Civil Code, Sec. 1146.

Dividends were paid on the stock to the holders of record. California Corporations

2. The testimony of Mr. Clarence C. Mannas, the Government accountant, does not supply the living witness, because he testified to nothing except what he found in the books.

3. There is no true equivalent in the English language for it. About the nearest word to it is "configuration". The word "picture" covers it, as when we say, in popular parlance, that "we have to take in the whole picture".

Code, Secs. 1500, 1504.: This fact appears on the books of the corporation, which record the transfer. The dividends were paid to the person named as the stockholder' in each certificate. They were reported by the defendant Lubic in her personal income tax returns for the corresponding years.

We cannot overlook the existence of the corporation as an entity. The Government must show by proper evidence or by inference which can be legally deduced that the title to this stock *did not* pass from Mrs. Cohen.

The Government admits that if their contention is correct, title did not pass and the defendants, if they appropriated the stock, —Mrs. Lubic by appropriating it to her own use and Cole by aiding her,—would be guilty of embezzlement. An embezzler is not required to make a return. Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884. And one who claims property as his own, openly and in good faith, is not guilty of either larceny or embezzlement, even though the claim be legally unfounded. While we are not concerned here with the individual return of the defendants, the fact that the alleged "embezzler" made a return of the income from the "embezzled" property is of utmost significance. For the legal inference from the fact, when coupled with the transfer of the stock on the corporate books, the recognition of ownership by the corporation during the lifetime of Mrs. Cohen, the reporting by the corporation of the dividends, shows the exercise of all the rights of ownership and their recognition by the corporation.

The mere fact that Mrs. Cohen was the chief stockholder in the corporation does not destroy the distinction between herself, her estate and the corporation. They are distinct entities. To my mind, the entire confusion in this case arises from the fact that some Government investigators,—and *I do not question their good faith*—have lost sight of this prime distinction. They have *assumed that everything Mrs. Cohen did, the corporation did, and vice versa.* But there is no warrant for such assumption.

After the death of Mrs. Cohen, the defendants *could not* have secured a transfer of the stock to the estate without an action for that purpose, compelling the corporation to recognize the estate as the real owner of the stock, because, on the books of the corporation the shares did not stand in the name of Mrs. Cohen. California Corporations Code, Secs. 2409–2410.

▆ A corporation may recognize the exclusive right of a person registered on its books as the owner of the shares to receive dividends and may hold him liable for calls and assessments on the shares so registered. California Corporations Code, Sec. 2465.

When dealing with an estate, we are not dealing solely with the persons who *may be* its chief beneficiaries. There may be creditors of the estate and the beneficiaries may receive no distributive share. The estate and the creditors may have rights in opposition to those of the individuals. The corporation could not have presented a claim against Mrs. Cohen or her estate for calls or assessments arising from the ownership of the stock until they had established that this stock, which had stood all these years in the name of an individual, was, in reality, the stock of Mrs. Cohen.

## V Inferences From Inferences

The Courts, in interpreting criminal statutes which require *knowledge* as an essential element of criminality, have warned us *not to draw inference on inference.* An interesting case on the subject is Wesson v. United States, 8 Cir., 1949, 172 F. 2d 931. This was a Harrison Narcotics Act case against a physician, in which the Government relied on circumstantial evidence to prove violation. The defendant was convicted. And the Court of Appeals was considering the question whether the evidence was sufficient to warrant conviction and whether the trial court erred in refusing to grant a judgment of acquittal. The Government had sought to prove unlawful *prescription* of narcotics from mere *possession*. The Court said that from the possession of narcotics, it would have to infer illegal possession, and from that illegal possession, it would have to infer an intention to violate the law

in giving prescriptions when sound medical practice did not warrant it. They quoted from one of their own prior opinions: "Such double inferences are too remote to constitute evidence. As said by the Supreme Court in United States v. Ross, 92 U.S. 281, 283, 23 L.Ed. 707: 'There are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain.'" 172 F.2d at page 936.

In the case before us, against all the facts heretofore mentioned, what do we have on the record? Only this fact, that after the dividend on the stocks was drawn and deposited to the account of the individual, a similar sum, *not in the exact amount,* made its appearance in the bank account of Mrs. Cohen. I do not believe that legally one to whom a gift of stock has been made can be deprived of ownership in it or have a legal inference of forfeiture of ownership drawn, from the mere fact of turning dividends back to the donor.

After all, as I said years ago in Nicholson v. United States, D.C., 1938, 25 F.Supp. 424, 426, it is not proper filial attitude to require strict accounting on the part of the parent who has made one the beneficiary of a trust. And the mere appearance on the bank account of the parent of a sum which is the equivalent of a dividend received by the daughter does not warrant an inference of absence of ownership in the latter.

Even if it had been shown that the same money was transferred, we could not draw the inference that the original transfer of the stock was fictitious, and that this "kickback" of the dividend evidenced it.

■ The Government would have to show by the testimony of some living witness or by documentary proof that the transfer of this money was made with the understanding that it was given to *overcome whatever presumption* could arise from the placing of the stock in the name of the daughter. Before the jury is allowed to draw this inference, there should be some evidence that Mrs. Cohen *did not* intend to part with the stock. The placing of a stock certificate in the hands of another with an endorsement does not transfer the ownership of the stock in the absence of a contract to that effect.

■ I do not need to refer to possible explanations. I am confining myself strictly to the narrow rule which says, in effect, that if one of two possible inferences is *legally permissible,* one which points to the guilt and one to innocence, the question presented is one of fact. And I point to the fact that no other legal inference is possible from the mere fact of these two unrelated facts, in the absence of other evidence to tie them together. And I find none in this record.

Now, how does this fit into the problem of inference upon inference? To make an inference of criminality under the rules discussed, the jury would have to draw not only an inference upon an inference, but an inference upon an inference upon an inference,—a "treble" inference, if it may be called so. From the fact that the stock was found in Mrs. Cohen's safety deposit box the jury would have to draw the inference that she never meant the stock to be in the name of the person who was designated as the stockholder in the certificate and on the books of the corporation. From that, they would have to infer that she never intended to convey any title whatsoever to that stock, when she paid for it and had the certificates issued. They would have to infer *from those two inferences* that Mrs. Lubic never was the owner of the stock, that the corporate documents were fictitious and did not speak verity, and that, consequently, when Mrs. Lubic and Mr. Cole failed to return this stock as the stock of the corporation and the dividends received from it, during their administration, they knew that this stock was the stock of Mrs. Cohen.

Reference has already been made to the fact that neither of these incidents, the finding of the stock endorsed in blank nor the return of the dividends to Mrs. Cohen, —assuming that it is established that they

were returned,—neither of them singly nor the two combined warrant a legal inference of ownership in Mrs. Cohen or her estate. If these inferences cannot be made legally,—even without the counter inferences which the record shows,—there is nothing to go before the jury. They amount to nothing but surmise or suspicion. And a case should not go before a jury if the facts are only of a character which may lead to speculative conjectures. This is especially true in a case of this character, which requires a specific intent,—*the intent to defraud the Government.*

The conclusion just announced,—on the basis of the law as applied to undisputed facts, is reinforced by the uncontroverted acts of the defendants, surrounding the filing of the return.

Decisions dealing with the quantum of proof in these cases require positive acts of concealment. The falsification of books or other "paper" work, instructions to those in charge to hide money or assets, or to fabricate records. No such facts appear n this record. On the contrary, the return itself offers proof of opposite intent. Instead of concealing the certificates which was found in the box end...sed in blank, the defendants referred to them in the return as excepted stocks "which are owned by others." This was notice to the Government,—if the Government needed any notice,—that there were items found in the box inventoried by the representative of the State of California which the executors had not returned as a part of the estate.

In the face of this, how can the Government maintain that there was concealment? For this is *revealment,*—just the opposite of *concealment.*

 It is also very significant that, having referred to the stock, the executors wrote, early in the administration of the estate, on March 20, 1943, asking for an audit of the return. If these defendants had been "the embezzlers" of the funds which the Government claims they were, they would have hidden from everybody the fruits of their theft. To the contrary, they made full disclosure. Without designating the stocks, they said, in effect, to the government, "This return includes all the stock, except what is claimed by others." They did not "fake" the books of the corporation, to hide the shares which Mrs. Lubic claimed. The Government knew that they stood in her name. They knew that the certificates had been found in the safety deposit box, endorsed in blank, and that the executors had asked for an early determination of the tax.

These facts show conclusively that there is no legal inference which a jury could draw from these facts that would support a conviction of violation of the statute.

One other matter must be referred to, and that is, the distribution of the $29,245 book account by the defendants. Mr. Cole did not benefit by the distribution. All I find in the record on the subject is this: That the heading of an account was changed from the name of Mrs. Cohen to that of an uncle, who states that they were never indebted to him. A year after the death of Mrs. Cohen, the money in this account was distributed to Mrs. Lubic and Mr. Cole and their children. In order to find that "the juggling" of this account constituted a "fraudulent withholding", I would have to infer from what was done a year after, that, at the time of the making of the return, the executors knew that this money belonged to Mrs. Cohen and withheld it from the account in order to defraud or attempt to defraud the Government of whatever tax was to become due.

At the beginning of this discussion, I pointed to the fact that the cases hold that the offense is complete *when the return is made.* And there is nothing in the record to show, or from which an inference can be drawn, that, at the time the return was made, the defendants intended to defraud the Government by failing to report the fund which they were to distribute to themselves a year later. The distribution must be considered in the light of the particular circumstances in the case. As these defendants were the chief beneficiaries of the estate, assume that, after the year had elapsed, and realizing that there would be substantial amounts to distribute, and that all the creditors had been paid,—they de-

cided to distribute this small sum to themselves,—unless they had filed a second return, we cannot retroject their action into the past in order to find fraud in the omission of this account.

The filing of the return is merely a *prima facie* act on the part of an executor reporting the property which came into his possession as a fiduciary. We do not know whether the corporation was solvent. Had the corporation become insolvent, of what worth would that $29,245 open book account be? The Government has not shown that the corporation was solvent, or that this account had any value. So, in this instance, as in the other instances discussed, we would have to draw an inference from an inference. And the inference would be *not* from any act done or committed, or a *declaration* made at the time the return was made, but from *what was done a year after*.

In stating these conclusions, I have eliminated the decisions which hold that, in weighing the evidence on a motion for acquittal, we are to consider the doctrine of reasonable doubt. For I am convinced that, even disregarding the doctrine of reasonable doubt, the facts in this case do not lend themselves to a legal inference that could spell guilt. The case should, therefore, be withdrawn from the jury.

The motion to strike will be denied.

But the motion for judgment of acquittal will be granted, and a judgment of acquittal will be entered, acquitting the defendants as to each count of the indictment.