UNITED STATES *v.* JOHNSON.*

No. 4.  Argued April 10, 13, 1942.  Reargued October 12, 1942.—
Decided June 7, 1943.

*Together with No. 5, *United States* v. *Sommers et al.,* also on
writ of certiorari, 315 U. S. 790, to the Circuit Court of Appeals for the
Seventh Circuit.

504

*Mr. Arnold Raum,* with whom *Solicitor General Fahy, Assistant Attorney General Samuel O. Clark, Jr.,* and *Messrs. Sewall Key, Ellis N. Slack, Earl C. Crouter, J. Louis Monarch,* and *Gordon B. Tweedy* were on the briefs, for the United States.

*Mr. Floyd E. Thompson* argued the cause on the original argument for respondents. *Mr. William J. Dempsey* was with him on the reargument, and *Mr. Conrad H. Poppenhusen* was with them on the briefs, for respondent in No. 4.

*Messrs. Harold R. Schradzke* and *Edward J. Hess* submitted on the reargument for respondents in No. 5. *Mr. John Elliott Byrne* was with *Mr. Hess* on the brief on the original argument.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an indictment in five counts. Four charge Johnson with attempts to defraud the income tax for each of the years from 1936 to 1939, inclusive, and charge a dozen others with aiding and abetting Johnson's efforts. The fifth count charges Johnson and the others with conspir-

acy to defraud the income tax during those years. The substantive counts charge violations of the penal provisions of the Revenue Acts of 1936 and 1938, now embodied in general form in § 145 (b) of the Internal Revenue Code, 53 Stat. 63, 26 U. S. C. § 145 (b). The conspiracy count is based on the old § 5440 of the Revised Statutes, which later became § 37 of the Criminal Code, 35 Stat. 1096, 18 U. S. C. § 88.

As to four of the defendants, the cause was dismissed upon motion of the United States Attorney; three others were acquitted by the jury. Of the six remaining defendants, the jury brought in a verdict of guilty on all five counts against Johnson, Sommers, Hartigan, Flanagan, and Kelly, and against Brown on counts three and four, the substantive counts for the years 1938 and 1939, and on the conspiracy count. The district court imposed on Johnson a sentence of five years on each of the first four counts and of two years on the conspiracy count, as well as a fine of $10,000 on each of the five counts. The terms of imprisonment were to run concurrently and the payment of $10,000 would discharge all fines. Lesser concurrent sentences and fines were imposed on the other defendants.

The Circuit Court of Appeals reversed the judgments. Its holding undermined the entire prosecution in that it found the indictment void because it was returned by an illegally constituted grand jury. But it went beyond that major ruling. It found the four substantive counts of the indictment, in so far as they charged defendants as aiders and abettors, fatally defective. Proceeding to the merits, the court held that the case properly went to the jury against Johnson on the last four counts and that the evidence sustained the verdict against all the defendants on the conspiracy count, but that a verdict should have been directed for Johnson on the first count and for the other defendants on all but the conspiracy count. Finally, it found that the testimony of an expert accountant for the

government invaded the jury's province and that its admission was prejudicial error. 123 F. 2d 111. Judge Evans dissented on all points. He found no infirmities in the indictment or in the rulings by the trial judge, and thought that the case was properly committed to the jury. *Id.,* 128. On rehearing, the Circuit Court of Appeals adhered to its views, but withdrew an erroneous part of its grounds for deeming admission of the expert accountant's testimony to be prejudicial. 123 F. 2d 142. We brought the case here because it concerns serious aspects of federal criminal justice. 315 U. S. 790.

Inasmuch as the initiation of prosecution through grand juries forms a vital feature of the federal system of criminal justice, the law governing its procedures and the appropriate considerations for determining the legality of its actions are matters of first importance. Therefore, in deciding that the defendants were held to answer for an infamous crime on what was merely a scrap of paper and not "the indictment of the Grand Jury" as required by the Fifth Amendment, the lower court went beyond that which relates to the special circumstances of a particular case. Unlike most of the other rulings below, the court here dealt with a matter of deep concern to the administration of federal criminal law. At the root of the court's decision is its finding that an order extending the life of the grand jury was void, and that the indictment was therefore returned by a body not lawfully empowered to act. A brief history of the proceedings which led to the filing of this indictment in open court on March 29, 1940, is therefore essential.

Terms of court of the District Court for the Eastern Division of the Northern District of Illinois are, by statute, fixed for the first Monday in February, March, April, May, June, July, September, October, and November, and on the third Monday in December. 28 U. S. C. § 152. This grand jury was impaneled at the December

1939 term of the district court, and was therefore empowered to sit through January 1940. By an order, the validity of which is undisputed, its life was continued into the February term. And on February 28, 1940, the district court authorized a further continuance of this grand jury during the March 1940 term. This is the order which gives rise to the controversy, for upon its legality depends the validity of the indictment thereafter returned by the grand jury. The disputed order reads as follows:

"Now comes the Second December Term 1939 Grand Jury for the Northern District of Illinois, Eastern Division, by Dorothy W. Binder, Forewoman, and in open Court requests that an order be entered authorizing them, the said Second December, 1939 Grand Jury, heretofore authorized to sit during the February 1940 Term of this Court, to continue to sit during the Term of Court succeeding the said February Term of Court, to-wit, the March 1940 Term of Court, to finish investigations begun but not finished by said Grand Jury during the said December 1939 and the said February 1940 Terms of this Court, and which said investigations cannot be finished during the said February 1940 Term of Court; and the Court being fully advised in the premises,

"It Is Therefore Ordered That the Second December 1939 Grand Jury, now sitting in this Division and District, be, and it is hereby authorized to continue to sit during the March 1940 Term of Court for the purpose of finishing said investigations."

The court below construed this order as authorizing the grand jury to sit during March to enable it to finish investigations begun in February, while under the governing statute, § 284 of the Judicial Code, 28 U. S. C. § 421, it could be authorized only "to finish investigations begun but not finished by such grand jury" during its original term, *i. e.*, the December 1939 term. So to read the order, however, is to dissociate language from its appropriate function and to disregard the historic rôle of the grand

jury in our federal judicial system. Since the law permits a continuance of the grand jury "to finish investigations" begun during its original term, the most elementary requirement of attributing legality to judicial action should, unless violence is done to English speech, lead to a reading of the order of February 28 so as to restrict the grand jury to that which it legally could do instead of to an expansive reading making for illegality.

The foundation for the holding that the order extending the grand jury into the March term purported to give authority in defiance of the statute is the phrase in the order reciting the grand jury's request that it be authorized to continue its sitting during the March term "to finish investigations begun but not finished by said grand jury during the said December 1939 and the said February 1940 Terms of this Court, and which said investigations cannot be finished during the said February 1940 Term of Court." The Circuit Court of Appeals read this to mean that the grand jury requested a continuance into the March term to finish investigations begun in the February as well as in the original December term. But surely the recital "to finish investigations begun but not finished by said grand jury during the said December 1939 and the said February 1940 Terms," is, at the worst, dubious as to what was begun and what was finished. Judge Evans rightly resolved the ambiguity by reading the disputed language "during the said December 1939 and the said February 1940 Terms" as qualifying "finished" rather than "begun," and therefore meaning that the grand jury was unable to finish during the December and February terms that which it had begun when it first came into being in the December term. Such a rendering makes good English as well as good sense. To read it as the court below read it is to go out of one's way in finding that the judge who granted the order of extension either wilfully or irresponsibly did a legally forbidden act, namely, to allow

a grand jury to sit beyond the term and take up new instead of finishing old business. For the legal limitations governing extension of the life of a grand jury do not lie in a recondite field of law in which a federal district judge may easily slip. Certainly every district judge in a great metropolitan center like Chicago knows that in authorizing a grand jury to continue to sit "for the purpose of finishing" their "investigations," the "investigations" must have been begun during the grand jury's original term and that new domains of inquiry may not thereafter be entered by the grand jury.

The failure of the court below to recognize the essential function of the grand jury in our system of criminal justice is revealed by its subsidiary argument in regard to the fourth count. Since that charges an attempted evasion of Johnson's taxes for the year 1939, and since such an attempt could not have become manifest prior to the filing of his return on March 15, 1940, the court reasoned that the "investigation" into this charge necessarily could not have been begun prior to the March term and that it therefore constituted a "new" investigation. Such a view misconceives the duties and workings of a grand jury. It is invested with broad investigatorial powers into what may be found to be offenses against federal criminal law. Its work is not circumscribed by the technical requirements governing the ascertainment of guilt once it has made the charges that culminate its inquiries. A grand jury that begins the investigation of what may be found to be obstructions to justice or passport frauds or tax evasions opens up all the ramifications of the particular field of inquiry. Its investigation in such cases may be into a course of conduct continuing during, and perhaps even after, its inquiry. And Congress certainly did not restrict a grand jury in dealing with all crimes disclosed by its investigation. The very purpose of the Act of February 25, 1931, 46 Stat. 1417, 28 U. S. C. § 421, allowing grand

juries to continue investigations beyond the arbitrary periods that constitute terms of court in the various federal districts, was to make the grand jury a more continuous and therefore more competent instrument of what have become increasingly more complicated inquiries into violations of the enlarged domain of federal criminal law. That Congress did not have a restrictive view of the "investigations" which a grand jury was authorized to pursue to completion beyond its original term is emphasized by the Act of April 17, 1940, 54 Stat. 110, amending the Act of 1931, *supra*. Under the original Act a grand jury was not permitted to sit "during more than three terms." But since the terms of court are of varying duration, a fact to which the attention of Congress was directed by the experience particularly in the Southern District of New York, Congress extended the potential life of a grand jury from "three terms," which in some districts might be only three months, to "eighteen months." The considerations which induced Congress to enlarge still further the already ample scope of grand jury investigations and the manner in which the House committee report spoke of a grand jury's work, see H. Rep. No. 1747, 76th Cong., 3d Sess., are but confirmation that that for which a grand jury may continue its sitting is the general subject-matter on which it originally began its labors. It is not forbidden to inquire into new matters within the general scope of its inquiry but only into a truly new, in the sense of dissociated, subject-matter.

One can hardly conceive of a clearer case of a continuing investigation of an old subject-matter than that presented here. The grand jury in December 1939 began investigation into alleged tax evasions by Johnson. It was allowed to continue its sitting during the February term, and its authority was further extended to permit it to sit during March. The grand jury found a systematic practice of tax evasion over a course of years, and

yet, so we are urged, it could not continue to ferret out one more phase of this continuous course of fraudulent conduct because that did not ripen into a separate offense until the last term of the grand jury's sitting. So to hold is to make of the grand jury a pawn in a technical game instead of respecting it as a great historic instrument of lay inquiry into criminal wrongdoing. See *Hale* v. *Henkel*, 201 U. S. 43, 65; *Blair* v. *United States*, 250 U. S. 273, 282; *Cobbledick* v. *United States*, 309 U. S. 323, 327.

By way of reinsurance of its main basis for invalidating the indictment, the Circuit Court of Appeals relied on a wholly different line of argument from that which we have just rejected. It held that the preliminary motions, by which the defendants sought to quash the indictment because of the grand jury's illegality, raised issues of fact. It therefore found that the district court, instead of granting the government's motion to strike the pleas in abatement, should have put the government to answer. The indictment itself alleged that the grand jury "having begun but not finished during said December Term . . . an investigation of the matters charged in this indictment, and having continued to sit by order of this Court . . . during the February and March Terms . . . for the purpose of finishing investigations begun but not finished during said December Term. . . ." The court below was apparently of the view that a mere denial of such a solemn allegation by the grand jury puts its truth in issue, that the burden is upon the government "to support it with proof," and that failure to vindicate the authority of the grand jury is "fatal." Assuming that under any circumstances a grand jury's allegation that the indictment which it returns was the outcome of an investigation "begun" during its original term and was not a forbidden new investigation "begun" during an extended term, within the meaning of § 284 of the Judicial Code, 28 U. S. C. § 421, presented a traversable issue, the cir-

cumstances that could raise such an issue would indeed have to be extraordinary and the burden of establishing it would rest heavily on defendants. Compare *Roche* v. *Evaporated Milk Assn., ante,* p. 21.

Were the ruling of the court below allowed to stand, the mere challenge, in effect, of the regularity of a grand jury's proceedings would cast upon the government the affirmative duty of proving such regularity. Nothing could be more destructive of the workings of our grand jury system or more hostile to its historic status. That institution, unlike the situation in many states, is part of the federal constitutional system. To allow the intrusion, implied by the lower court's attitude, into the indispensable secrecy of grand jury proceedings—as important for the protection of the innocent as for the pursuit of the guilty—would subvert the functions of federal grand juries by all sorts of devices which some states have seen fit to permit in their local procedure, such as ready resort to inspection of grand jury minutes. The district court was quite within its right in striking the preliminary motions which challenged the legality of the grand jury that returned the indictment. To construe these pleadings as the court below did would be to resuscitate seventeenth century notions of interpreting pleadings and to do so in an aggravated form by applying them to the administration of the criminal law in the twentieth century. Protections of substance which now safeguard the rights of the accused do not require the invention of such new refinements of criminal pleading.

Another ruling of general importance in the law of criminal pleading was made by the Circuit Court of Appeals. It will be recalled that the first four counts charge Johnson with attempts to defraud the revenue, and that the other defendants are in the same counts charged as aiders and abettors of Johnson. The court below ruled that a demurrer of the defendants other than Johnson to

those four counts should have been sustained. It found that these counts were, as to the co-defendants, both inconsistent and duplicitous. They were deemed inconsistent in that the offenses against Johnson were charged as of March 15th of each year, whereas the co-defendants "as aiders and abettors are charged with an offense which extended over a period of years." They were deemed duplicitous in that the co-defendants were in each count charged with conduct that aided and abetted Johnson both before and after March 15th of the relevant year, and were therefore, in the court's view, charged in the same count as accessories both before and after the fact.

We are constrained to say that the court was led into error by a misreading of the statutes which underlie these counts and the allegations which laid the offenses. The basis of each of the four counts, we have noted, is a penal sanction in successive revenue laws, now generalized by the provision in the Internal Revenue Code, 53 Stat. 63, 26 U. S. C. § 145 (b), which makes it a felony for any person who, being subject to the income tax, "willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof." Section 332 of the Criminal Code (18 U. S. C. § 550) makes every person who "directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission" a "principal." The vice of the lower court's ruling is its misconception of the nature of the offense defined by § 145 (b) with which Johnson is charged, as well as that of the relation of aiders and abettors, made principals by § 332 of the Criminal Code to such an offense. In short, the Circuit Court of Appeals read the substantive counts as though they charged Johnson merely with the filing of false returns on March 15th. That may only be a misdemeanor under § 145 (a) of the Internal Revenue Code, but that is not the offense with which Johnson was

charged. He was charged with a felony made so by § 145 (b), the much more comprehensive violation of attempting "in any manner to defeat and evade" the payment of an income tax. The false return filed on March 15th was only one aspect of what was a process of tax evasion. And all who contributed consciously to furthering that illicit enterprise aided and abetted its commission and thereby, under § 332 of the Criminal Code, became principals in the common enterprise. Therefore, nonparticipation in merely one phase of Johnson's attempted evasion, namely, the filing of a false return on March 15th, is in itself irrelevant, and it is equally irrelevant that the aid which the co-defendants gave Johnson continued after March 15th as well as preceded it. The crime of each of the first four counts is the wilful attempt to evade the payment of what was due to the revenue. All who participated in that attempt were contributors to the illicit enterprise. There was only one offense in each count, and all who shared in its execution have equal responsibility before the law, whatever may have been the different rôles of leadership and subordination among themselves. There is neither inconsistency nor duplicity in these four counts and the demurrers to them were properly overruled.

There remain only questions pertinent to this case, and more particularly whether the evidence warranted leaving the case to the jury. This was a six weeks' trial of which the record, even in the abbreviated form used on appeal, runs over a thousand printed pages. We have painstakingly examined it all, but it would be unprofitable to give more than the barest outline of what went to the jury. The details sufficiently appear from the two opinions below.

Johnson was a gambler on a magnificent scale. The income which he himself reported from winnings for one of the years in question exceeded a quarter of a million

dollars. The lowest annual income so reported for the period is more than $100,000. His co-defendants were plainly smaller fry in Chicago's gambling world. Their reported annual gambling income during the same period ranged from $3,600 to $19,000. Concededly Johnson frequented some half-dozen gambling houses, ostensibly separately owned by the others found guilty, excepting only Brown who was the nominal owner of a so-called currency exchange which furnished private banking facilities for these gambling houses. Indisputably, also, Johnson had a continuous and close relation to these gambling houses. The decisive issue of fact was whether Johnson's relation to these resorts was that of a patron or of a proprietor. The testimony both for the government and for the defendants focussed on that question. During the course of his extensive testimony, Johnson himself put simply and completely the only real problem before the jury when he swore that he "never had any financial interest in any gambling Club operated by any of the defendants."

The jury decided this central issue against Johnson. And the argument that there was not enough evidence on which a jury was entitled to make such a finding does not call for extended discussion. In making this ultimate finding the jury must have found that the string of gambling houses with which Johnson was associated over a period of years, while ostensibly conducted as separate enterprises by his co-defendants in separate ownership, was in fact a single unified gambling enterprise. A voluminous body of lurid and tedious testimony, often through obviously unwilling witnesses, amply justified the jury in finding that these pretended separate houses were under a single domination. The testimony also amply justified the conclusion that Johnson owned a proprietary interest in this network of gambling houses and was not merely a patron or an occasional accommodating dealer when other

patrons desired to play for stakes beyond the conventional limit. Having been justified in finding that the individual defendants were screens behind which Johnson operated, the jury was also justified in finding that there were winnings from these houses on which Johnson attempted to evade income tax payments. Even such records as were kept in these houses were destroyed. But that these gambling transactions were on an enormous scale was overwhelmingly established. It is not to be expected that the actual financial transactions of such a vast illicit business would appear by direct proof. Compare *United States* v. *Wexler*, 79 F. 2d 526. The long duration of this gambling business, the substantial evidence of the operation of the law of probability in favor of the houses, such records as there were pertaining to the private banking facilities and currency exchanges which were at the service of these houses, made it not a matter of tenuous speculation but of solid proof that there were winnings of a substantial amount which Johnson did not report.

That he had large, unreported income was reinforced by proof which warranted the jury in finding that certainly for the years 1937, 1938, and 1939, the private expenditures of Johnson exceeded his available declared resources. It is on this latter ground—namely, that presumably Johnson's expenditures justified the finding that he had some unreported income which was properly attributable to his earnings from the gambling houses—that the court below thought that the evidence on three of the substantive counts, those for 1937, 1938, and 1939, was sufficient to go to the jury. That is enough to sustain the judgment against Johnson, for the sentences on all the counts were imposed to run concurrently.

Of course the government did not have to prove the exact amounts of unreported income by Johnson. To require more or more meticulous proof than this record discloses that there were unreported profits from an elab-

orately concealed illegal business, would be tantamount to holding that skilful concealment is an invincible barrier to proof. ". . . the probative sufficiency of the testimony has the support of the District Court (in which is included the verdict of the jury) and of the Circuit Court of Appeals. It would take something more than ingenious criticism to bring even into question that concurrence or to detract from its assuring strength—something more than this record presents." *Delaney* v. *United States*, 263 U. S. 586, 589–90. And this consideration—the concurrence of both courts below in the sufficiency of the jury's verdict—renders unnecessary further discussion of the verdict against all the defendants, including Brown, on the conspiracy count. For while Brown was also convicted on two substantive counts, the conspiracy charge is sufficient to absorb his sentence.

Not many words are needed to dispose of the question of the sufficiency of the evidence to warrant submission to the jury of the substantive counts against the other aiders and abettors, Sommers, Hartigan, Flanagan, and Kelly. In holding that the motion for directed verdicts on the counts charging aiding and abetting should have been granted, the court below was largely misled by its erroneous conception, with which we have already dealt, of the crime of aiding and abetting in the circumstances of this case. In other words, as a matter of evidence as well as a matter of pleading, the court was dominated by the notion that the co-defendants did not aid and abet Johnson if they actually did not share in the making of his false return on each March 15th. The nub of the matter is that they aided and abetted if they consciously were parties to the concealment of his interest in these gambling clubs of which they themselves pretended to be proprietors. Evidence of conduct, acts and admissions, amply warranted the trial court to send the substantive counts against the aiders and abettors to the jury.

A ruling on evidence, much pressed upon us, must finally be noticed. The court below held that the admission of the testimony of an expert witness regarding Johnson's income and expenditures during the disputed period invaded the jury's province. The witness gave computations based on substantially the entire evidence in the record as to Johnson's income. The Circuit Court of Appeals held that while undoubtedly "a proper hypothetical question could have been framed and propounded," in fact the witness was not giving answers on the basis of any assumption or hypothesis but as testimony on the "controverted issue" in the case. 123 F. 2d at 128. We do not so read the meaning of this testimony. No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury. The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests for charges that were either redundant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's we ought not be too finicky or fearful in allowing some discretion to trial judges in the con-

duct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.

The decision below must therefore be reversed and the cause remanded to the Circuit Court of Appeals for proper disposition in accordance with this opinion.[1]

*Reversed.*

MR. JUSTICE ROBERTS concurs in that portion of the opinion which deals with the validity of the indictment. He is of opinion that the judgment of the Circuit Court of Appeals should be affirmed because, in the case of Johnson, substantial trial errors in the admission of evidence operated to his prejudice, and, in the case of the other defendants, because there was no evidence whatever to prove that they aided or abetted Johnson in any effort to commit a fraud upon the revenue and none to prove that they were parties to a conspiracy with him having the same object.

MR. JUSTICE MURPHY, MR. JUSTICE JACKSON and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

---

[1] After the case came here, the Government asked that the petition as to Flanagan, who had died, be dismissed. Accordingly, we dismiss the writ as to Flanagan and leave the disposition of the fine that was imposed on him to the Circuit Court of Appeals. See *United States* v. *Pomeroy,* 152 F. 279, reversed in 164 F. 324.