## BEATY v. UNITED STATES.
### No. 6760.

United States Court of Appeals,
Fourth Circuit.

Argued June 1, 1954.

Decided June 14, 1954.

**714**

James M. Baley, Jr., U. S. Atty., Ashville, N. C., for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Keith M. Beaty was convicted of violating Section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b), under an indictment in three counts, of which the first count related to the tax year 1945 and charged that the defendant did wilfully and knowingly attempt to defeat and evade a large part of the income tax due and owing by him to the United States for that year by maintaining or causing to be maintained false books and records, by concealing assets and covering up sources of income, by preparing or causing to be prepared a false income tax return and by filing and causing to be filed with the Collector of Internal Revenue for the Internal Revenue Collection District of North Carolina a false and fraudulent income tax return wherein he stated that his net income for the calendar year was the sum of $48,490.98 and that the amount of tax due thereon was the sum of $24,350.55, whereas as he then and there well knew, his net income for the calender year was $254,701.83 upon which he owed to the United States an income tax of $209,785.06.

The second and third counts in similar terms charged attempts to defeat and evade the income tax for the years 1946 and 1947 alleging in the second count as to 1946 a false and fraudulent return of income of $75,265.42 and a tax due of $42,526.74, whereas the income was $174,715.24 and the tax due was $125,565.03 for the year; and alleging in the third count as to 1947 a false and fraudulent return of income of $48,283.69 and a tax due of $22,937.04, whereas the income was $86,077.04 and the tax due was $50,960.08.

The District Judge entered judgment of imprisonment for two years as to each of the counts of the indictment, the sentences to run concurrently and not consecutively. In addition the court im-

John W. Muskoff, Jacksonville, Fla., and Llewellyn A. Luce, Washington, D. C. (W. M. Nicholson, Charlotte, N. C., on brief), for appellant.

posed a fine of $10,000 on the first count of the indictment, a fine of $5,000 on the second count, and a fine of $5,000 on the third count, the fines to be cumulative, making a total fine of $20,000, in addition to the court costs.

The principal contentions on this appeal are that the court lacked jurisdiction over the offenses charged in the indictment and that the evidence was insufficient to sustain the verdict of the jury. The statute, 26 U.S.C.Int.Rev. Code, § 53(b), requires that the income tax return of an individual shall be made to the collector for the district in which is located the taxpayer's legal residence or principal place of business. Beaty resided and was engaged in several business enterprises in Charlotte, North Carolina, in the Western District of North Carolina, in which the indictment was found and the case was tried; but the office of the Collector (now Director) of Internal Revenue was located in Greensboro, North Carolina, in the Middle District of North Carolina, where the tax returns of the defendant were filed. Hence it is contended that the offenses charged were triable only in the Middle District of North Carolina and the court below was without jurisdiction.

This contention, however, overlooks the fact that the defendant was not indicted for wilfully failing to make returns and pay the taxes in violation of Sec. 145(a), or for making returns which he did not believe to be true and correct as to every material matter, in violation of Section 145(c) of the statute, but for attempting to evade or defeat the payment of the taxes by maintaining false books and records, by concealing assets, and covering up sources of income, and by preparing and filing false and fraudulent income tax returns. It has been held in cases where the charge was confined to an attempt to evade the tax by filing a fraudulent return that the offense was committed where the returns were filed. See the conflicting decisions in United States v. Aaron, D.C.N.D.W.Va., 117 F.Supp. 952, and United States v. Albanese, D.C.S.D. N.Y., 117 F.Supp. 736. The charge in the case at bar, however, includes the making of false records and the concealment of assets, and if any of these acts are proved to have occurred in the Western District of North Carolina, the case is made out and the trial court had jurisdiction.

We have had occasion to consider kindred questions in a number of earlier cases. In Bowles v. United States, 4 Cir., 73 F.2d 772, we held that a resident of the District of Columbia, which is part of the Revenue Collection District of Maryland, was triable in the District Court for the District of Maryland for wilful failure to make an income tax return for 1930 and for a wilful attempt to evade the income tax of 1931 by filing a false and fraudulent return. In Reass v. United States, 4 Cir., 99 F.2d 752, we held that a defendant indicted for making a false statement to influence the action of a Federal Home Land Bank in Pittsburg, was triable in Pennsylvania where the statement was presented to the bank, and not in Maryland where the statement was prepared, since the essence of the crime was the act of delivering the statement to the bank. In Newton v. United States, 4 Cir., 162 F.2d 795, however, we held that a defendant indicted for aiding in the preparation of a false and fraudulent claim in connection with an amended income tax return was triable in the Western District of Virginia where the claim was prepared, although the claim was filed in the office of the Collector of Internal Revenue in Richmond, in the Eastern District of the State. From the decision in the last mentioned case it appears that the crime there under consideration is committed by any person who "aids" or "assists in" the preparation of the return, and that the acts performed by the defendant in the preparation of the return took place in the Western District of Virginia. Resting the decision on this phrase Judge Dobie pointed out, 162 F.2d 796:

> " 'All federal crimes are statutory, and these crimes are often defined, hidden away amid pompous

verbosity, in terms of a single verb. That essential verb usually contains the key to the solution of the question: In what district was the crime committed? Without the exact language of the statute, particularly this verb, paraphrases and loose citations in this field are more than inaccurate; they are positively misleading. When, as is so often the case, the statute enumerates several such verbs, only scrupulous, even meticulous, nicety in exact quotation can prevent these statutes, as well as the decisions under them, from proving a snare and a delusion to the unwary'."

See also United States v. Johnson, 319 U.S. 503, 514, 63 S.Ct. 1233, 87 L.Ed. 1546; Shurin v. United States, 4 Cir., 164 F.2d 566. Cf. United States v. United States District Court, 6 Cir., 209 F.2d 575.

In Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, the court held that the wilful failure to make a return and to pay the tax, which are made misdemeanors by Sec. 145(a) of the statute, do not without more constitute attempts to evade or defeat the tax which is made a felony by Sec. 145(b). The court said, 317 U.S. 498, 499, 63 S.Ct. 368:

"The difference between the two offenses, it seems to us, is found in the affirmative action implied from the term 'attempt,' as used in the felony subsection. It is not necessary to involve this subject with the complexities of the common-law 'attempt'. The attempt made criminal by this statute does not consist of conduct that would culminate in a more serious crime but for some impossibility of completion or interruption or frustration. This is an independent crime, complete in its most serious form when the attempt is complete and nothing is added to its criminality by success

or consummation, as would be the case, say, of attempted murder. Although the attempt succeed in evading tax, there is no criminal offense of that kind, and the prosecution can be only for the attempt. We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony.

"Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner'. By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime."*

---

* The court did not comment in this case on Sec. 145(c) of the statute which makes it a felony for an individual to make a return which he does not believe to be true and correct in every material manner.

We reach the conclusion that the District Court had jurisdiction in the case at bar since the prohibitory words of the statute are directed against "any person who wilfully attempts in any manner to evade or defeat any tax imposed by this chapter," and the proof relates to activities of the defendant performed in the Western District of North Carolina.

### Beaty Service Company.

In proof of the charges that the defendant attempted to evade payment of the income taxes by maintaining false records and covering up sources of income, the Government relies particularly upon the disparity between the income reported and the income received by Beaty in the tax years from the enterprises known as Beaty Service Company and Lancaster Distributing Company. The Beaty Service Company was nominally an incorporated body but there was abundant evidence to show that it was in fact Beaty's individual property. Only three qualifying shares of stock were ever issued, one to Beaty, one to his father and one to his brother. No records of corporate activities as such were kept and no dividends were paid. The father died in 1943 and there was no administration on his estate. The brother invested no money in the business and received none therefrom, except a salary.

The operating records of the business were kept in Beaty's office. The bank deposits were made by him and only such monies as he reported to the bookkeeper were recorded. He only was authorized to draw checks upon the bank account. He put up his own securities as bond, under which the company operated. The employees received instructions from him alone; the corporate income tax returns were signed by him. Aside from the permissible inference that the corporation was only a name, and that the business belonged to Beaty individually, so that the income therefrom should have been included in his personal return, there was evidence to show that Beaty collected income from the business and did not deposit it in the corporate bank account. Receipts from the enterprise consisted of taxicab rentals, bonding fees from cabs owned by individuals who operated under the Beaty bonding system, and proceeds from the sale of automobiles. Taxicab rentals were $10 per day except on Saturday and Sunday when they were $12 per day, payable at 6 P.M. on each day. During the tax years Beaty operated 32 to 38 cabs. Bonding fees amounted to $7 per week on 20 to 32 additional cabs operated by individual owners. Monies from these sources were placed in envelopes marked with the number of the cabs and delivered to Beaty's office and counted. Beaty made the deposits in the bank at irregular intervals and delivered duplicate deposit slips or the bank book to the bookkeeper so that entries might be made on the corporate books. No record was retained to indicate how much was received from any individual cab or individual driver, and the envelopes and daily check sheets were destroyed. Hence the only record of income was a cash journal made from the record of bank deposits furnished by Beaty, while the expenses were itemized in detail and receipts and documentary proof retained.

The record of the sales of the cars was also found to be defective. Ten sales which were proved to have been made were not recorded at all and 23 cars were reported to have been sold at prices less than the money actually received therefrom.

Under these circumstances the United States sought to prove the receipts of the business by producing 83 taxi drivers as witnesses who testified as well as they could as to the days they worked and the rental and bonding fees which they paid. The government also checked the reports of operations maintained under the local law by the Police Department of the City and produced an account of the true income prepared by tax accountants. This account tended to show that the income actually received by the Beaty Service Company or

by Beaty, which was not reported either in the corporate or individual tax returns, amounted to $55,103.29 in 1945, $32,461.97 in 1946, and $21,696.85 in 1947, or a total of $109,262.11.

### Lancaster Distributing Company.

The story of the Lancaster Distributing Company, which can only be given in broad outline, also gives support to the inference that Beaty received taxable income in 1945 and 1946 which he did not include in his returns. In the summer of 1944 he induced one E. C. Pundt, an auditor who had previously had charge of the books of the Beaty Service Company, and was a trusted friend, to go into the wholesale whiskey business. Pundt was totally inexperienced in this field and lacked financial means but Beaty promised to back him and accordingly Pundt set up the business in Lancaster, South Carolina, in September of that year. He advanced $7500 in cash, $2500 of his own money and $5,000 which he borrowed from one Passons. The first shipment of goods was received on open account from Sol Feldon of Baltimore, an associate of Beaty. Later shipments of substantial size were purchased with funds borrowed from the American Trust Company on collateral furnished in every case by Beaty which at times amounted to as much as $250,000. Beaty himself made numerous trips to New York and Philadelphia to purchase the goods, Pundt remaining in South Carolina except for a few trips to Philadelphia. Beaty had and exercised the right of drawing checks on the bank account.

The testimony of Pundt as to the ownership of the business was in effect that at the outset he was to be the proprietor and Beaty the backer of the enterprise; but it is evident that Beaty was the monied man and exercised actual control from the beginning. This was made clearer by the execution of a document some time after the establishment of the business in September, 1944 and before its subsequent incorporation in March of 1946, wherein it was agreed that Pundt and Passons were to work for the business on a salary basis and Beaty was to have complete control. Pundt's copy of this document was later destroyed but there was no denial of its existence and Pundt himself, during his examination as a witness, declared that it was for some one else to determine the ownership of the business since he did not know whether he was competent to do so himself.

Moreover, on one occasion Beaty told a whiskey man in Baltimore that the business of the Lancaster Distributing Company was his and that Pundt was running it for him. On another occasion Beaty used an indebtedness due by the business to Feldon as a credit on an indebtedness due by Feldon to him. Again in 1946, when Pundt gave a check for $5,000 to the United States in part payment of income taxes due by the business, Beaty undertook to stop payment on the check.

It is manifest that the jury might well have found that the business belonged to Beaty and that the income therefrom was taxable to him. The evidence indicated a business of substantial size in 1944, 1945 and 1946, from which profits covered by tax returns in Pundt's name were derived. Using approximate figures the sales in 1944 amounted to $400,000 and the profits $24,000; in 1945 the sales amounted to $2,000,000 and the profits $93,000; in 1946 (three and a half months) the sales amounted to $1,000,000 and the profits $37,000. The aggregate income taxes paid for these year amounted to approximately $72,000, leaving a deficit in taxes of $5,000. It appears that the profits were allowed to remain in the business and that no money was paid by Pundt to Beaty other than enough to cover his traveling expenses and a salary which in amount exceeded the salary paid to either Pundt or Passons. Had these profits been reported as the income of Beaty, his taxes would have been substantially increased and would have exceeded the combined taxes paid in his name and in the name of the business.

In 1945 the defendant paid an income tax of $24,350.55 but had he included in his income the profits of the Lancaster Distributing Company, his taxes would have amounted to $94,487.05. The personal return of Pundt for the year 1945 showed taxes of $56,994.41, so that by dividing the income as above indicated, the loss to the government was $13,142.09. The Government suffered a similar loss in the year 1946.

In March, 1946 it was decided to incorporate the business under the same name and the evidence indicates that thereafter the business was unprofitable and the details need not be recited herein. It is sufficient to say that upon incorporation common stock in the sum of $100,000 was subscribed, of which Beaty paid $51,000 in cash, and Pundt and Passons $24,500 each, which was borrowed from the American Trust Company on notes endorsed by Beaty. In 1946, when Petrushansky, a Baltimore whiskey dealer, and his auditor came to Charlotte to reconcile an account for merchandise, Beaty gave them to understand that he was the owner of the Lancaster Distributing Company, Inc.

Expert Testimony of Parrish and Cline.

In order to reduce the complicated facts of the Beaty business enterprises to comprehensible form and scope, the government made use of the services of John F. Parrish and R. L. Cline, Treasury Department accountants, and placed them on the stand to explain their investigations and to give their opinion as to the correctness of the defendant's tax returns. It is now objected that Parrish was not qualified as an expert and that it was an invasion of the province of the jury to allow either accountant to express an opinion as to the meaning of the evidence.

▅▅ There was no error in allowing Parrish to testify as an expert witness. The defendant raised no objection to his qualifications when he was offered as an expert and if there had been objection, it would have been proper to overrule it, for the witness started as an employee of the Government Accounting Office in 1937, later had three years' experience as an auditor and cost accountant, and after service with the armed services for three and a half years, was appointed Special Agent in the Intelligence Division of the Treasury Department and shortly thereafter was assigned to investigate the defendant's liability under the income tax law. His performances in this case indicate that he knew his business.

Before reaching conclusions in the matter, Parrish carefully examined all the books and records made available to him by the defendant. For example, he studied the books of account and the bank account of the Beaty Service Company, the semi-monthly reports of the business to the Charlotte Police Department signed by Beaty and filed in obedience to a city ordinance, and in the absence of the daily reports of the taxi drivers, which had not been preserved, he interviewed more than one hundred men to ascertain the average rental and bonding fees paid to the company; he also checked the automobile records of the State and the prices paid by the purchasers of the cars. By these means he was able to reconstruct with substantial accuracy the income of the company from these sources and to compare it with the amounts shown on the income tax returns; and in order to make his conclusions easily understood, he prepared charts which were exhibited to the court and jury. The basis of these conclusions was shown by the introduction of the records in evidence and the production on the witness stand of the taxi drivers and car purchasers.

▅ It does not appear that the charts were formally introduced in evidence, but to all intents and purposes they formed a part of the testimony. They were exhibited to the jury, and at the end of the case were taken by the jury to their room to be examined during their deliberations upon the verdict. It is objected that the charts were shown to the jury before the supporting

evidence was introduced, and that it was improper for them to be taken to the jury room at the end of the trial. Doubtless the more regular procedure would have required the introduction of the supporting evidence before the conclusions of the experts were shown; but this evidence was finally made available, and most of it was produced before the cross examination of the witnesses began. The defendant suffered no prejudice by the order in which the testimony was adduced. There was likewise no impropriety in affording the jury an opportunity to examine the charts before rendering their verdict, since the attorney for the defendant himself consented "to putting any and all of the evidence in" and thereupon the charts were taken to the jury room in the presence of the attorney without objection.

All of the facts hereinbefore recited tending to show that the Lancaster Distributing Company before incorporation was the personal property of Beaty and did not belong to Pundt were also put in evidence independently of the testimony of the expert witness.

■ The witness Cline in 1945 also undertook an investigation of the Beaty businesses, and pursued much the same course as Parrish. He also demonstrated that in 1945, 1946 and 1947 Beaty made large expenditures in excess of those reported in his tax returns for these years. It is objected that this evidence was devoid of probative effect because the amount of money in Beaty's possession at the beginning of the period was not shown in the evidence and hence the money expended by him may have been derived from this source. This evidence, however, if not conclusive, was admissible for the light it threw on the defendant's methods of carrying on business. See Bell v. United States, 4 Cir., 185 F.2d 302, 310. For example, in 1945 these expenditures included $20,000 deposited as collateral for a loan with the bank; and in the same year the bank released to the defendant $70,000 in cash which had been placed with the bank prior to 1945 as collateral for a note. No explanation is given for such transactions. In 1946 these expenditures amounted to more than $64,000 including more than $10,000 deposited in cash with the broker, and $51,000 in cash deposited in the bank at the time of the incorporation of the Lancaster Distributing Company.

■ The trial judge was careful to instruct the jury that they were in no sense bound by the expression of opinion by the expert witnesses, although it was based on substantially all of the evidence adduced in the case. The judge at the conclusion of the Parrish testimony, cautioned the jury that the evidence of Parrish was merely his opinion and consisted of a recapitulation of the figures which the Government contended showed the unreported income of the defendant; that the jury were to accept these opinions only if they were satisfied beyond a reasonable doubt that the opinions were predicated on facts testified to in the evidence; and that if the opinions were not supported by the evidence it was the duty of the jury to disregard them and to base their conclusions upon the evidence which they believed to be true. A similar caution was given to the jury with respect to the expert testimony in the charge of the court at the conclusion of the case. The course followed by the court in this case was in accordance with the established rule. In United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546, the court was confronted with a question which arose under similar circumstances and said, 319 U.S. 519, 63 S.Ct. 1241:

"* * * No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury. The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests for charges that were either redun-

dant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's, we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules."

### Restriction of Cross-Examination.

The defendant contends that the judge erred in unduly restricting the cross examination of the Government's expert witness Parrish, and in making improper comments to the jury in so doing. The subject under cross examination at the time that the rulings complained of were made was the investigation that the witness had made of the records kept or filed by the defendant in respect to the operation of the taxicabs of the Beaty Service Company. The purpose was to show that the witness in calculating the time when certain cabs were operating and producing revenue had not made sufficient deductions when the cabs were idle and undergoing repairs. We have examined the transcript of record and we do not find that the defendant's attorney was prevented from bringing out the facts favorable to his case in this or any other respect. Nor do we find that the judge trans-

gressed his authority in making the comment during the cross examination that the expert could not be blamed for errors in his calculation which were based on records prepared or filed by the defendant.

The cross examination of the witness consumed two and a half days during which he was subjected to a rigorous questioning on every phase of the case. The scope of cross examination is ordinarily discretionary with the trial judge and particularly must this be so when complicated transactions are involved and the cross examination may be drawn out to such an extent as to obscure the object in view. The cross examination of a witness is a matter of right but the trial judge has the power and duty to keep it within a proper limit. We do not find that there was any abuse of this discretion in the pending case. See Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; Bell v. United States, 4 Cir., 185 F.2d 302, 310; Beaty v. United States, 4 Cir., 203 F. 652, 656; Garber v. United States, 6 Cir., 145 F.2d 966, 970; Pullman Co. v. Hall, 4 Cir., 55 F.2d 139, 141.

### Objections to the Charge in the Presence of the Jury.

The defendant also contends that at the close of the judge's charge his attorneys were required to state their objections to the charge in the presence of the jury in violation of Rule 51 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which directs that an opportunity shall be given to counsel to make their objections to the charge in a criminal case out of the hearing of the jury.

The judge in the pending case, at the end of his charge, inquired whether the attorneys desired any further instructions. The defendant's attorneys suggested that the court had failed to mention certain matters in evidence and had not instructed the jury as to the rules governing circumstantial evidence although he had previously indicated that he would give an instruction on this

point. The court thereupon stated that a charge on circumstantial evidence was not required in the case, but made certain additions to the charge. He then inquired again whether the defendant had any additional objections to the charge. At no time did the attorneys for the defendant request that the jury be excluded during the discussion of the charge and they do not now indicate that they were in any way prejudiced by the discussion which took place in the jury's presence. Under these circumstances the failure of the court to exclude the jury did not constitute reversible error.

■ There was no error in refusing a requested instruction of the defendant on the subject of circumstantial evidence. In the request it was stated that the United States relied in the case upon circumstantial evidence and that if the evidence as to any essential element was circumstantial only, it must be of such a character as to exclude every reasonable hypothesis except that of guilt; and if it was not, the defendant should be acquitted. The instruction as offered was too broad because it implied that the case of the Government was based substantially on circumstantial evidence whereas a great part of the evidence was direct. Moreover, the charge of the court was so clear as to the doctrine of reasonable doubt that the jury could not have been misled by the failure to have a charge expressly directed to evidence circumstantial in character. The judge not only called the attention of the jury to the need to be satisfied beyond a reasonable doubt during the course of the taking of the testimony, but at the end of the case instructed the jury that the burden was on the Government to prove the case; and that the income taxes due by Beaty during the years 1945, 1946, and 1947, as charged in the indictment, must be shown to have been due by him beyond a reasonable doubt; and that the jury must be satisfied also beyond a reasonable doubt that Beaty wilfully and knowingly attempted to evade his in-come tax obligations to the United States. We are satisfied that the defendant was given every instruction to which he was entitled.

■ There was no error in the words of caution addressed to the jury at the beginning of the case when the judge warned the jury not to talk about the case to members of their family or any one else, and that they should bear in mind that they might be watched by some agency that had in mind the prime purpose of seeing that a fair verdict should be rendered. The case was doubtless much in the public eye due to the variety and extent of the activities of the defendant in the community and the actions of the jury during the long trial were necessarily more or less in the public eye. We do not find that there was any prejudice to the defendant in this action.

■ Nor do we find that there was prejudicial error at the conclusion of the case when the foreman of the jury was permitted to come alone into the court room from the adjoining jury room and to ask of the court whether a recommendation could be made by the jury in favor of the defendant because of the condition of his health. To this the court replied that a recommendation on the part of the jury was always proper and would be considered by the court. This occurrence took place after the jury had the case under consideration for a considerable period of time, and thereafter the jury returned a verdict of guilty with a recommendation of mercy. Undoubtedly communications between the court and the jury should be made in the presence of all of the jurors; but it is manifest that the communication of the court to the foreman of the jury in this case was reported by him to his colleagues and that the defendant was in no way prejudiced by the jurors' recommendation, as will appear from the fact that the judgment of the court, insofar as imprisonment is concerned, was limited to two years on each count, to run concurrently.

Affirmed.