Constantine Thomas and Marie Thomas v. Commissioner. Constantine Thomas v. Commissioner.
Thomas v. Commissioner
Docket Nos. 47178, 47179.
United States Tax Court
T.C. Memo 1957-244; 1957 Tax Ct. Memo LEXIS 2; 16 T.C.M. (CCH) 1123; T.C.M. (RIA) 57244; December 31, 1957
*2 Held: Deficiencies determined by net worth method, and additions to tax for fraud not sustained. Charles H. Morin, Esq., for the petitioners. Paul J. Henry, Esq., and Chester M. Howe, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: In a Memorandum Findings of Fact and Opinion filed February 24, 1955, (T.C. Memo. 1955-46) [14 TCM 156,] we sustained with minor adjustments, deficiencies for the years 1943 to 1948, inclusive, determined by the net worth method, and held that the taxpayers' returns were false and fraudulent with intent to evade tax. The Court of Appeals for the First Circuit reversed on April 12, 1956, (232 Fed. (2d) 520), and remanded the cases for the admission of further evidence, for findings as to the petitioners' cash on hand at the commencement and termination of each of the taxable years, for findings of a likely source of taxable income, and for other proceedings not inconsistent with its opinion. Further evidence was introduced at hearings in March 1957. For the sake of clarity we will restate the findings of fact originally made with such additions or changes *3 as appear necessary from the additional evidence. The computation of net worth was agreed upon, except for the amount of cash on hand at the beginning and end of each of the taxable years 1943 to 1948. Findings of Fact The petitioners are husband and wife. They reside in Chelmsford, Massachusetts. During the taxable years 1943 to 1948, inclusive, Constantine Thomas, sometimes known as Charles Thomas, owned 97 per cent, and Marie Thomas owned 2 per cent of the stock of Thomas, The Master Cleaner, Inc., hereinafter referred to as the corporation, a Massachusetts corporation doing business in Lowell, Massachusetts. Thomas was president and treasurer of the corporation and in complete control of the business carried on, which was dry cleaning and the repair, storage and sale of furs. The corporation filed Federal income tax returns with the collector of internal revenue at Boston upon an accrual basis and covering calendar years. Constantine Thomas was born in about 1894 and came to the United States from Greece at the age of 10 years. He has since resided in the United States. From about 1918 until about 1932 he engaged in various business ventures including the taxicab business, *4 dealing in used cars, operating a restaurant, and investing in a hotel. About 1929 he started a dry cleaning business under the name of Highland Cleaners and Dyeing. He sold this after operating it for a year or two. He also worked in a brokerage firm and in a foreign exchange bank. Thomas also invested in stocks on margin or on borrowed funds and had an account with a brokerage firm in Boston. He borrowed from the Union Bank of Lowell, or its predecessor. In 1932 he had collateral on deposit with the bank as security for a loan. The bank asked for more collateral but Thomas refused to furnish it at the market and advised the bank to sell the collateral held. Thereafter the market broke and the value of the collateral fell. The bank then sold the collateral and charged off $8,926.85 as a loss. In about 1932 Thomas started his present dry cleaning business. It was incorporated in February 1935. Constantine and Marie were married in 1938. Marie's father, Christo Vangos, was manager of a confectionery establishment in Easthampton, and Marie's mother worked in that business. At the time of the marriage of the petitioners, Vangos gave them money to assist in buying a home. Marie helped *5 Constantine in his business for about a year after their marriage. In 1940 the corporation sought a loan for $4,500 from the Reconstruction Finance Corporation (hereinafter referred to as the R.F.C.) to provide improvements and expand fur storage facilities. Thomas considered that an R.F.C. loan could be had at a low interest rate. The Union National Bank of Lowell agreed to participate up to 20 per cent in the loan, provided the bank receive a compromise offer of $400 in full payment of the loan to Thomas charged off in 1932 in the amount of $8,926.85. Thomas paid the amount of $400 in installments at the rate of $7 per month beginning in June 1940 and making a final payment of $148 in December 1943. The corporation's loan was reduced by installment payments to $3,586.83 on July 13, 1941. On that date, a new loan of $5,400 was made absorbing the balance due on the old. This new loan was reduced by November 1942 to $2,070.30 which was paid December 7, 1942. Thomas, individually, borrowed $800 from the same bank in May 1940 and paid the loan in January 1942. In April 1941, the corporation applied to the R.F.C. for a loan of $1,800 for the purchase and installation of two pieces *6 of equipment. The application contained a balance sheet of the corporation as of December 31, 1940, and was accompanied by a statement of Thomas' personal assets. The corporation's financial statement showed cash on hand $1,272.81, total assets $22,353.02, current liabilities of $3,837.37 and a chattel mortgage to the R.F.C. for $3,960. Net sales for the five preceding years were stated as ranging between $25,000 and $27,000 annually. Thomas' salary was stated to be $2,500 a year. The ownership interest was shown as common stock $5,000; surplus, donated, $8,438.36; and undivided profits, $1,117.29. The statement purporting to show as of April 26, 1941, all assets and liabilities of Thomas, other than his interest in the corporation, shows cash on hand $200; securities $1,660; real estate valued at $11,000 (having an assessed value of $7,000); furniture $3,000; cash surrender value of life insurance, $647; and shows liabilities of $5,150. Thomas filed an income tax return for 1940 showing no tax due. He filed no return for 1941. His return for 1942 showed a tax of $33, of which two quarterly installments were paid in March and June 1943. His return for 1943 reported total income of *7 $2,658 consisting of salary of $2,550 and dividends of $108. Tax withheld was greater than the tax due and a refund was made. His return for 1944 reported income of $2,652.50, consisting of salary $2,550 and interest $102.50. The petitioners' joint return for 1945 reported salary of $5,000 and dividends or interest of $500.62. Their joint return for 1946 reported salary $5,200, dividends $579.40 and interest $213.44. Their joint return for 1947 reported salary $5,100, dividends $957.50 and interest $613.47. Their joint return for 1948 reported salary $4,940, dividends $1,186.61, interest of $669.80, and long-term capital gain of $80. In December 1943 Vangoes made two gifts of $3,000 each for the benefit of the petitioners' two children. $2,900 of each gift was deposited in a savings account for the benefit of the child. It is stipulated that at the beginning of 1943, Constantine Thomas had the following assets, other than cash on hand: ASSETS
Bank Accounts - Central Savings Bank
#107875
$ 50.54
Bonds
5,000.00
Securities -
5 shares Radio Corp. of America
56.25
14 shares Wright Aeronautical Corp.
992.25
90 shares Maraceabo Oil Ex. Co.
1,242.29
Loans Receivable
3,002.45
Real Estate
5,500.00
Equity in corporation - Thomas, The
Master Cleaner, Inc.
5,000.00
*8 During the year 1943 Thomas' personal and living expenditures amounted to $2,779.40. At the end of 1943 he had assets to the value of $28,940.71, other than cash on hand, and no liabilities. During the year 1944, Thomas' personal and living expenditures amounted to $2,629.08. At the end of 1944 he had assets of $34,059.44, other than cash on hand, and liabilities of $1,494.50. At the beginning of 1945 assets of Constantine and Marie Thomas amounted to $34,059.44, other than cash on hand, and their liabilities amounted to $1,494.50. During the years 1945 to 1948, inclusive, their living expenses were as shown below and their assets, other than cash on hand, and their liabilities as of the end of each year were as follows: Living
End of Year
Expenses
Year
During Year
Assets
Liabilities
1945
$5,500.62
$ 51,222.55
1946
5,992.84
58,101.72
$ 282.34
1947
6,671.07
82,274.71
5,000.00
1948
6,836.41
104,497.20
5,000.00
Thomas' interest in the corporation is valued at $5,000 in the foregoing computations of assets. At the end of 1943 his assets included loans receivable from the corporation of $1,794.86. At the end of 1944 his liabilities *9 included loans payable to the corporation amounting to $1,494.50. At the end of 1945 the petitioners had loans receivable from the corporation of $1,128.79. At the end of 1946 loans payable to the corporation by the petitioners amounted to $282.34. The petitioners had loans receivable from the corporation amounting to $19,868.74 at the end of 1947, and $41,325 at the end of 1948. On March 26, 1946, and on August 29, 1949, the petitioners submitted net worth statements to the Department of State, Visa Division, for the purpose of satisfying the immigration authorities as to the ability of Thomas to provide financially for a relative whom he brought to the United States from Greece. The statement submitted in 1946 showed assets of a market value of $86,978.56, including $29,211.72 as book value of 99 per cent of stock of the corporation on December 31, 1945, and $1,128.79 as accounts receivable from the corporation, and no liabilities. Income for 1946 from all sources was estimated as salary of $5,000, share in profits of the corporation of $6,930, and investment income of $973.90. The statement submitted in 1949 showed assets of a market value of $123,290.47, including $25,894.04 *10 as book value on December 31, 1948, of 99 per cent of the stock of the corporation, and $41,325 as accounts receivable from the corporation, and no liabilities. Income from 1949 from all sources was estimated as salary $5,000, and interest or dividends amounting to $1,809.61. In 1944 Vangos and his wife came to live with the petitioners. In the petitioners' income tax returns for 1946, 1947 and 1948, Christo and Jatina Vangos, parents of Marie, were claimed as dependents. Vangos engaged in no income producing activities in those years. Vangos died in 1953. In Probate Court his estate was appraised at $45,209.84, consisting of cash $2,733.92; Baltimore & Ohio Bonds $4,505; Government bonds $30,617.50; Notes $6,143.42 and personal property $1,110. In 1947 Thomas purchased 15 Bendix automatic washing machines and opened a laundromat operation as an addition to the corporation's business. The investment in these machines was not entered on the corporation's books until the end of 1948. The amount of $2,936.25 was then added to the machinery account. These were coinoperated machines. A girl was placed in charge of them who turned over to the bookkeeper the receipts from this operation. *11 Opinion The Court of Appeals remanded this proceeding for the determination of two principal issues: (1) The amount of cash on hand (as distinguished from cash on deposit in banks) held by the petitioners as of the beginning of each taxable year, and (2) whether the evidence shows a likely source from which the increases in the petitioners' net worth were derived. In view of our conclusion upon the second point stated, we find it unnecessary to discuss the first. In its reversal of our opinion the Court of Appeals stated: "A further contention of the taxpayers which merits consideration is that the respondent has not properly satisfied the requirement established by the Supreme Court in Holland v. United States, 1954, 348 U.S. 121, 75 S. Ct. 127, 136, 99 L. Ed. 150, that there must be '* * * proof of a likely source, from which the jury could reasonably find that the net worth increases sprang * * *.' Respondent contends that this rule has no application in cases involving the civil fraud penalty or routine cases of deficiency. We do not agree. We think it is of equal importance in a civil case to show that the taxpayer's net worth increases are attributable to *12 currently taxable income. It seems to us more reasonable to view this particular requirement as an indispensable element of the net worth method in any of its applications rather than as an additional safeguard superimposed upon the net worth method for the sole benefit of defendants in criminal cases - particularly in view of the very favorable position which such persons already enjoy with respect to the burden of proof. "Respondent further contends that in any event the requirement has been met because the taxpayers' corporation is a possible source of taxable income which could account for the net worth increases. We think this argument assumes the very fact to be proved. There must be some independent showing that the corporation might be the source of the unreported income, not merely a negative inference arising from the prior assumption that the increases were taxable and therefore must derive from the corporation since no other taxable source is apparent. "In United States v. Johnson, 1943, 319 U.S. 503, 63 S. Ct. 1233, 87 L. Ed. 1546, the taxpayer concealed his ownership in various enterprises which were possible sources of the unreported income. In the *13 Holland case the business was proven to be capable of producing much more income than was reported and in an amount sufficient to account for net worth increases. "No such showing has been made in the instant case. The books of the corporation are admittedly consistent. Of course this does not prove they are honest, but in the absence of some independent evidence to the contrary, we believe that respondent has not indicated a likely source of taxable income. There can be no presumption that the books of the corporation are wrong, for any such approach would render entirely nugatory this particular safeguard against abuses of the net worth method." [Italics supplied.] In Massei v. United States (C.A. 1, 1957) 241 Fed. (2d) 895, certiorari granted, 353 U.S. 964, the Court of Appeals for the First Circuit referred to its opinion herein, stating: "Recently, in reviewing a civil tax deficiency case, we interpreted the above language as meaning that proof of a likely source is 'an indispensable element of the net worth method in any of its applications.'" We take this to mean that under the remand it is incumbent on the respondent to prove here a likely *14 source of taxable income by affirmative evidence independent of the fact that the taxpayers' net worth has increased, and that in the absence of such a showing the petitioners are not obliged to prove that the increases are from nontaxable sources. In Holland v. United States, 348 U.S. 121 (1954) there was evidence that not all the income of a hotel business had been included in its books. In United States v. Calderon, 348 U.S. 160, the records of the receipts of a coin-operated machine business were shown to be incomplete. In these cases convictions involving use of the net worth method were upheld. The respondent contends that the increases in the net worth of these petitioners came from unreported income derived from the corporation. We have examined the evidence concerning the corporation and its books. On the original record herein the Court of Appeals commented that the "books of the corporation are admittedly consistent. Of course this does not prove they are honest, but in the absence of some independent evidence to the contrary, we believe that respondent has not indicated a likely source of taxable income." The additional evidence introduced *15 at the rehearing is not sufficient to warrant a finding that the books of the corporation misrepresented its income. Nor is it shown that this kind of business venture must necessarily have been vastly more profitable than as represented in the corporation's tax returns. Under these circumstances we are unable to find that the corporation was the source of unreported income. This is an "indispensable" element in the case and the consequence of this is that the deficiencies and additions to tax determined may not be sustained. The question of the amount of cash on hand at the beginning of each of the taxable years becomes moot and we make no new findings on this point. Decisions will be entered for the petitioners.