Scott **KORTZ,** Appellant (Defendant),

v.

The **STATE of Wyoming,**
Appellee (Plaintiff).

No. 86–158.

Supreme Court of Wyoming.

Dec. 4, 1987.

---

Leonard Munker, State Public Defender, and Gerald M. Gallivan, Director, and Loyd E. Smith, Student Intern, of Wyoming Defender Aid Program, for appellant.

A.G. McClintock, Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Emily Kingston, Legal Intern, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT, and MACY, JJ.

MACY, Justice.

Appellant Scott Kortz was indicted by a Campbell County grand jury for delivery of, or possession with the intent to deliver, a controlled substance. Following a trial to the jury, appellant was found guilty of delivery of methamphetamine.

We affirm.

Appellant sets forth the following issues for our determination:

"I. WHETHER CERTAIN STATE-MENTS MADE BY APPELLANT FOL-LOWING A PROMISE OF IMMUNITY DURING CUSTODIAL INTERROGA-TION WERE INVOLUNTARY AND THEIR INTRODUCTION INTO EVI-DENCE CONSTITUTED A DENIAL OF DUE PROCESS.

"II. WHETHER THE GRAND JURY, IN SITTING BEYOND THE TERM FOR WHICH IT WAS CALLED, LACKED JURISDICTION TO RETURN AN IN-DICTMENT AGAINST APPELLANT."

Appellee State of Wyoming states the issues as follows:

"I. WERE CERTAIN SELF–INCRIMI-NATING STATEMENTS MADE BY AP-PELLANT, FOLLOWING THE GIVING OF MIRANDA WARNINGS, WHICH APPELLANT ACKNOWLEDGED THAT HE UNDERSTOOD AND SUB-SEQUENTLY WAIVED, VOLUNTARY AND THUS ADMISSIBLE INTO EVI-DENCE AT TRIAL?

"II. WAS AN INDICTMENT RE-TURNED BY THE GRAND JURY, DULY IMPANELED PURSUANT TO WYOMING STATUTORY LAW, VALID AS AGAINST APPELLANT FOR THE CRIME OF WHICH HE WAS SUBSE-QUENTLY CONVICTED?"

I

On November 8, 1985, following his arrest, appellant was interrogated by Deputy John Bruner of the Campbell County sheriff's office. Prior to trial, counsel for appellant filed a motion in limine in which he requested an order prohibiting any testimony concerning the interrogation. Counsel renewed his motion in chambers prior to trial on February 4, 1986. At that time, the prosecutor indicated, out of the presence of the jury, that he intended to offer only selected parts of the interrogation. On that basis, the district court took appellant's motion under advisement until such time as the prosecution made its offer of proof. During Deputy Bruner's testimony at trial, the prosecution made an offer of proof concerning the statements made by

appellant during the interrogation. Out of the hearing of the jury, Deputy Bruner testified that, prior to interrogating appellant, he advised him of his rights in accordance with Miranda. He then testified that, during the interrogation, appellant admitted he had been dealing methamphetamine.

At the conclusion of the prosecution's offer of proof, counsel for appellant objected to Deputy Bruner's testimony in part on the ground that "all of the damning testimony, the testimony involving dealing occurred only after he made this statement to [appellant] that we're not going to use this against you if you'll just talk to us." Following argument on the objection, the court held

"that the statements given by [appellant] were given voluntarily, he had been advised of his constitutional rights, stated that he understood them, and as has been pointed out to the court, he refused to answer some questions even after the statement * * * by Deputy Bruner. Obviously, [appellant] did not take that as an offer of immunity of any kind."

On that basis, the court denied appellant's motion. Counsel for appellant then asked that the transcript of the interrogation be considered part of the record for purposes of appeal. The trial continued, and the prosecutor presented to the jury Deputy Bruner's testimony concerning the interrogation.

On February 13, 1986, following appellant's conviction, counsel for appellant filed a motion for a new trial based in part on the admission into evidence of inculpatory statements made by appellant during the interrogation. Following a hearing, the court denied the motion. Appellant now claims before this Court that the statements were improperly admitted in that they were involuntary. More specifically, appellant contends that the statements he made during the interrogation concerning his involvement with drugs were induced by Deputy Bruner's implied promise that the statements would not later be used against him.

We have previously said that, in determining whether statements made by an accused are voluntary, the totality of the circumstances surrounding the interrogation must be examined:

" 'Only if the "totality of the circumstances surrounding the interrogation" reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " *Frias v. State*, Wyo., 722 P.2d 135, 142 (1986), quoting *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (emphasis omitted).

In the present case, it is clear that appellant was fully and fairly advised of his rights prior to questioning. He clearly indicated that he understood his rights and agreed to talk to Deputy Bruner. Prior to any statement by Deputy Bruner which may be construed as an offer of immunity, appellant admitted that he had "used dope." Thereafter, in the course of the interrogation, Deputy Bruner stated that:

1. "Uh, I'm sure that you heard our standard, uh, deal. You know, we don't care what kind of a narcotics relationship you've got with anybody, but we need to know to sew these people together with other people, and, uh, we let quite a few people around it .. no questions asked ... provided they tell us some information that can help us."

2. "I need to fill in some blanks. That's the only way I can help you and that's the only way you can help me * * *."

3. "What I'm doing is throwing a lifeline out to you so you can grab ahold * * *. This is your way out."

4. "I'm not going to tell you I could * * * make an Indictment disappear * * *."

5. "And * * * you know I can't promise you anything * * *."

6. "I'll help you if I can, but, you know, it has gotta be a two way street."

Even after Deputy Bruner made the statement about which appellant complains, appellant remained uncooperative in responding to the questions asked. It was only after Deputy Bruner suggested that appellant was being exploited by his friends that appellant began to talk about

his involvement with drugs. Having carefully considered the totality of these circumstances, we are unable to conclude that appellant was induced or coerced to talk by the conduct of Deputy Bruner.

## II

██ The grand jury which indicted appellant was impaneled during the 1985 spring term of the district court. The indictment against appellant was filed November 7, 1985, during the fall term of the district court. Appellant argues that the grand jury lacked jurisdiction to issue the indictment after the expiration of the term in which it was impaneled.

"At common law the term of service and of power of a grand jury ended at the expiration of the term of court in which it was called. Under some statutes it is held that the grand jury's jurisdiction or power also comes to an end on expiration of the term. Under others it is held that the grand jury is empowered to continue its activities after expiration of the term of court for which it was organized." 38 Am.Jur.2d, Grand Jury § 31 at 977–78 (1968).

There is no statute in Wyoming governing the terms of county grand juries. We, therefore, adopt the position that a county grand jury may continue the activities for which it was convened after expiration of the term of court in which it was impaneled. In support of our holding, we note the following statement by the Oregon Supreme Court:

"To * * * hold that a grand jury must be discharged at the end of each term [of the court for which it was impaneled] in the midst of an uncompleted investigation, thereby compelling the successor grand jury to again enter the same investigation ab initio would disrupt the judicial process [and] contribute to the law's delays * * *." *State v. McReynolds*, 212 Ore. 325, 319 P.2d 904, 906 (1957).

Affirmed.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

I dissent. This case, the tail-ender of the Campbell County grand jury cases, presents several issues already discussed in that litany, and as otherwise addressed are here noted only to maintain a consistent position.

## I. GRAND JURY VALIDITY

It is my analysis that the grand jury processes employed in the Campbell County session did not provide constitutional due process. Although this issue was not again addressed by brief in this, the ninth appeal, the prosecution of Scott Kortz is even more egregious by virtue of the delayed indictment to be extensively discussed as a principal section of this dissent. I do not accept the entire Campbell County grand jury process as sufficient to meet either constitutional criteria or rule and statutory intent for due process and equal protection. See my dissent in *Hennigan v. State*, Wyo., 746 P.2d 360 (1987).

## II. REQUIRING PLEA WITHOUT ASSISTANCE OF COUNSEL

The trial court required entry of a plea after the accused requested counsel and before consultation could occur. Pervasive and accentuated in light of rule and constitution, this case again presents the unacceptable status to ignore Rule 6, W.R. Cr.P., in denying an opportunity to the arrested and incarcerated defendant to have advice of counsel before being required to plead. *Burke v. State*, Wyo., 746 P.2d 852 (1987). *Lee v. State*, Wyo., 743 P.2d 296 (1987), although reversed on other grounds, also presented the same disaffinity.

## III. POST COUNSEL REQUEST INTERROGATION AFTER ARRAIGNMENT

The trial court admitted into evidence a statement taken ex parte by investigating officers after the defendant requested counsel and before the incarcerated defendant had an opportunity to obtain legal advice. Every rule, principle and morality

was violated when, after counsel was requested in open court, the investigative officers made ex parte contact in order to obtain inculpatory statements. This is not just plain error; it is abject malfeasance in prosecutorial conduct. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, reh. denied 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); *State v. Mailo,* Hawaii, 731 P.2d 1264 (1987). See also *Best v. State,* Wyo., 736 P.2d 739, 742 (1987):

> " * * * Our court is committed to the protection of that right [that an accused may not be compelled to be a witness against himself, Art. 1, § 11, Wyoming Constitution], and following the requirements of the Supreme Court of the United States as enunciated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, reh. denied 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966), we require appropriate advice with respect to that right including the right to counsel in order to secure the privilege. *Dryden v. State,* Wyo., 535 P.2d 483 (1975). No further interrogation is permitted after a person in custody has invoked the right to counsel until counsel has been made available or that person voluntarily initiates further communication indicating a desire to waive that right. *Edwards v. Arizona,* [supra]; *Cheatham v. State,* Wyo., 719 P.2d 612 (1986); *Daniel v. State,* Wyo., 644 P.2d 172 (1982); *Dryden v. State,* supra."

## IV. FACTS

This unusual case requires consideration in its factual context.

In late 1984 and early 1985, an undercover narcotics agent came to Gillette to find controlled-substance prosecutorial opportunities in this blue-collar-young-people investigation in the Gillette community. Eight other appeals have resulted from the some 64 or more individual persons charged and several hundred separate counts processed through a three-day grand jury session. Two of the appealed cases were presented at later reconvened grand jury sessions—this case and one other.

Gary Woolsey, as a co-conspirator charged in an early indictment, testified that on February 8, 1985 he acquired controlled substances from appellant for the purpose of sale to the undercover agent, David M. Lauck. Charged with one count in the grand jury session on June 26 and 27, he entered a plea of guilty. In the late 1985 session, evidence of the February 8, 1985 acquisition of the substance by Woolsey was introduced at appellant's trial on the basis of the co-conspirator relationship as the actual evidence of criminal statute violation. For a current discussion of co-conspirator statement admissibility, see *People v. Anderson,* 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306, 1311 (1987).

The sale by Woolsey was made on February 8, 1985, and the grand jury rendered a decision to indict him in June, which indicting session then adjourned, only to be called back to convene on November 7, after the end of the term of the district court in Campbell County. This special reconvened session occurred some eight months after the event which was the subject matter of the charge, and approximately five months after Woolsey, the alleged co-conspirator, had been indicted and then pled out.

The plot then thickened. On *November 6, 1985,* under a search warrant not included in the appeal record, the mobile home occupied by appellant was searched, under the pretext of gathering evidence of the crime of destruction of property by virtue of some remodeling and other tenant damage to the premises. The criminal complaint for destruction of property had been secured, or was later obtained,[1] but the record does not indicate any basis in fact or fancy upon which the initial search was conducted.[2] When the destruction search

---

1. The landlord-tenant relationship was considered in a civil suit filed December 9, 1985, involving unpaid rent and undefined damage to the mobile home.

2. Examination of the search warrants which were only on file in the County Court apparently, are presently instructive. Obviously the landlady had access to enter and could take the officers into the unit. Obviously, also, the is-

warrant was executed, some equipment which could be used for drug possession purposes, but not controlled substances, was "seen" in the mobile home. Not surprisingly, a second search warrant was then "prepared," signed, and executed on the same day to obtain possession of the items whose existence had been earlier determined by execution of the first search warrant. There can be no doubt that the first search warrant was executed in order to obtain knowledge sufficient to support a second warrant. Both searches were conducted in the absence of the defendant, and the record does not indicate whether he ever knew that they had been conducted until long after arrest.

On the following day, the grand jury, which would have ordinarily expired with the end of the term of court on the 8th day of September, 1985, was reconvened to indict Kortz. No available record establishes whether Agent Lauck's testimony was presented directly or by second-person hearsay to the grand jury. However, it is likely, if this case followed the normal pattern of this grand jury proceeding, not only that Lauck did not testify before the grand jury since only his statement was used, but that the incriminating facts used for Kortz's indictment were third-party hearsay obtained from Woolsey who had related the facts of the acquisition of the controlled substance for his resale by comments to Lauck. The grand jury convened on November 7, 1985, and an arrest warrant was prepared late that afternoon. Sometime between 11:00 and 11:30 a.m.

sues were civil. The deputy sheriff stated in his signed and filed November 6, 1985 affidavit:

"4. The Search Warrant is being sought to search a mobile home described as follows: a white 1970, 12 × 50 foot Flamingo mobile home with a wooden porch attached to the west side. The mobile home is located at # 6 Roosters Roost, Rooster's Roost subdivision in Campbell County, Wyoming. The owner of the mobile home is Darlene Jevning.

"5. I went with Investigator Bruner to the above described mobile home to execute a Search Warrant which was issued the 6th day of November, 1985 from the County Court located in Campbell County, Wyoming. Upon arrival to the above described mobile home Investigator Bruner and I executed the aforementioned search warrant upon the mobile home.

"6. I and Investigator Bruner determined that there were no occupants in the residence and upon discovering this, and with the permission of the landlord, entered the mobile home. Upon entering the mobile home, the first room is a livingroom.

"7. I and Investigator Bruner while in the livingroom saw the following items which were in plain view:

"a. a roach clip, razor blade (single edged), zig zag papers, a triple beam scale, and a syringe (U100) with a needle attached.

"The items were all located in a white hutch located in the livingroom inside the above described mobile home.

"8. In the livingroom was a bong on a shelf next to the white hutch. A Bong is used to smoke controlled substances.

\* \* \* \* \* \*

"10. Your affiant, based on information received from Deputy Rawlings of the Campbell County Sheriff's Office in a previous contact with the above named defendant, believes that it is possible and very probable that the above named defendant has compartments in the walls of the out buildings in which he has stored or hidden controlled substances or narcotics paraphernalia. Deputy Rawlings informed your affiant that a reliable informant had stated that the above named defendant previously had hidden controlled substances or paraphernalia in such secret compartments within the walls in his previous residence.

"11. Your affiant seeks a Search and Seizure Warrant to seize the above described items and any other paraphernalia or narcotic or controlled substances contained within the mobile home in order to prevent the destruction of such property and to preserve such evidence. In addition, your affiant seeks permission to search the out buildings next to the above described mobile home in order to detect any other contraband or narcotics paraphernalia that your affiant believes is located in the out buildings of the above described mobile home based upon the above stated facts."

On November 8, the Sheriff's office had no trouble locating Randy Kortz at work where undoubtedly he was on November 6 also. Obviously, Kortz had been under surveillance since February or June. It would shock the contemplative credibility of the ages to believe that Officer Bruner first looked in the mobile home *after* he got the property-damage search warrant.

On the same day, with great efficiency, the drug-use material observed on the first excuse of a search warrant matured into a second search warrant again executed before Kortz returned from work. That document has an interesting facet, since the affidavit subscription line first had an *October date,* marked out to accommodate the events of the second search on November 6, 1985.

appellant was arrested at his place of work, taken to the Sheriff's office, and then subjected to an interrogation session without an opportunity for either counsel or arraignment.

It is as a specific subject that the first interrogation comes directly to this court on an appeal issue phrased whether introduction of those statements obtained upon a promise of immunity during custodial interrogation constituted a denial of due process. This travesty of criminal process was not to end there. Having pursued the interrogation process to the examiner's present satisfaction, an arraignment was scheduled for the late afternoon, at which time Kortz was required to plead, despite his request for an opportunity to obtain counsel.

In part, that arraignment session included the following when, in advance of plea, the court related to the defendant:

"So, Mr. Kortz, you are charged with delivery or possession with intent to deliver a controlled substance called methamphetamine.

"If you are convicted of that, or if you plead guilty to that, you may receive a penalty of up to ten years imprisonment and a $10,000 fine.

"In addition, you could be required to pay costs of prosecution, you could be required to make any restitution, if there is any, for instance, the only thing I could think of would perhaps be buy [sic] money in this case, or, and—I should say—you can be required to repay the state and the county for the costs of a court-appointed attorney, if [you] wish one.

"And my understanding is that you do not wish one.

"THE DEFENDANT: Right.

\*　\*　\*　\*　\*　\*

"THE COURT: That's correct. And you also recall what I said about restitution and all of those things?

"THE DEFENDANT: Yes, sir.

\*　\*　\*　\*　\*　\*

"THE COURT: Additionally, you have a right to be represented by counsel at every stage of these proceedings, either one of you[r] own choosing, if you wish to hire one, or if you cannot afford one, one will be appointed for you.

"Do you understand all of your constitutional rights?

"THE DEFENDANT: Yes I do.

"THE COURT: Do you have any questions about any of them?

"THE DEFENDANT: No, I don't.

"THE COURT: Do you wish to have counsel appointed for you, or are you going to hire your own attorney?

"THE DEFENDANT: I was going to [hire] my own attorney.

\*　\*　\*　\*　\*　\*

"THE COURT: Do you have any money with which to hire an attorney?

"THE DEFENDANT: I got a pay check coming.

"THE COURT: For how much?

"THE DEFENDANT: With high hopes of continuing to work, I'll have close to $600 in two weeks.

"THE COURT: I will be real candid with you, Mr. Kortz. I'm not certain you'll be able to retain an attorney for that.

"I'm going to give you a chance to try, but attorneys are pretty expensive here in Campbell County.

\*　\*　\*　\*　\*　\*

"THE COURT: Well, my concern, and I guess we need to talk about that, and maybe we should not get to that yet.

"You have not yet consulted with an attorney.

"Do you wish to enter a plea at this time?

"THE DEFENDANT: Yes.

"THE COURT: And are you intending to plead not guilty?

"THE DEFENDANT: Yes.

"THE COURT: All right. To the charge of delivery of methamphetamine, as contained in the indictment, how do you plead?

"THE DEFENDANT: Not guilty."

Kortz was first arrested and interrogated, and after he asked for representation was then required to plead. But this story

still does not end. Despite the fact that he had requested counsel and entered a plea of not guilty, the Campbell County Sheriff's office next arranged to conduct a reinterview at a time when the defendant had not yet been able to post bond or secure the desired legal assistance. After giving notice of request to talk to an attorney, he was reinterviewed on November 12, while in jail, by the ever-present undercover agent Lauck, in the absence of counsel or any opportunity to have legal advice. To reiterate, an interview was conducted after his request for counsel while he was in jail, and before he could secure legal assistance. During this interview, additional incriminating statements were elicited for use in his prosecution. Clearly, this course of events violated Mr. Kortz's imperative right to advice of counsel under the Fifth and Fourteenth Amendments to the United States Constitution, as expressed by the United States Supreme Court in *Edwards v. Arizona*, supra.

Following the obviously certain conviction based on co-conspirator testimony, a pretextual search, a pretextual warrant, and a post-arraignment interview after his request for counsel, Kortz was sentenced to 18 months to 4 years in the state penitentiary.

## V. IMMUNITY PROMISE

Having set the stage with the introductory subjects of this appeal, discussion is directed to briefed arguments.

Appellant first states in his brief:

"Certain statements made by appellant following a promise of immunity during custodial interrogation were involuntary and their introduction into evidence constituted a denial of due process."

Unfortunately, the thrust of the argument in appellant's brief was directed at a promise of immunity. Consistent with the idiom that it takes two to tango, it is obvious from a careful review of the record that the deputy sheriff neither intended to promise, nor promised immunity. However, it is also clear that the deputy intended to fraudulently misrepresent his purpose. The deputy gave the impression that he was trying to obtain evidence on a double murder, when, in the context of the overall circumstances, it was obvious that, having already secured the indictment, the purpose was to get incriminating statements to justify the previously invalid search warrant and to support the prospective testimony of the alleged co-conspirator. Obviously, appellant was not going to be taken to a judge until an effort was made to tie down the flapping ends of the dragnet.

The interview commenced as follows:

"John [Deputy Sheriff]: Scott, the reason that we are here is I need to visit with you a little bit about some cases that I'm working on,"

and then concluded at 4:24 p.m., so that having secured the comprehensive details the arrested defendant could be taken to the court for arraignment where he would first be afforded an opportunity to ask for but not then secure legal counsel.[3]

Clearly, the intent of the questioning was to utilize the examination about the condition of the rented property and about the community murders in order to secure statements which could be used for defendant's conviction on the Woolsey statements about which Kortz was apparently unaware. I could find fraud, or exceptional expertise, but not promised immunity.

## VI. TERM OF GRAND JURY

The term of court for the Campbell County District Court ended September 8, 1985, and the Kortz charge was presented

---

**3.** Serious question exists as to whether in fact the statements were made inculpatory on a relevant issue. Other than some suggestions by the examiner, there really was nothing said by the defendant except as an atmosphere was created which made available a conviction by a bad reputation. Any proper application of materiality and relevance would probably have excluded the evidence as irrelevant to the commission of the crime for which the indictment had been returned. He was set up by the derived characterization of being a "druggie." In pretextual activity, this case has similarities to the pajamalady case which was reversed. *Brown v. State,* Wyo., 738 P.2d 1092 (1987).

to the grand jury and the indictment returned as noted on November 7, 1985. As a singular issue amidst the multitude of objectionable circumstances, I dissent because I disagree with the novel position taken by the majority regarding the continuing jurisdiction of this particular grand jury activity.[4]

Preliminarily, we have no way of knowing why Woolsey was indicted at the June session, while Kortz's involvement was not pursued until November. As a matter of fact, we do not know much about any of the grand jury sessions except from newspaper reports and from their final report issued shortly after this indictment.[5]

The grand jury investigation apparently first probed the defendant's involvement in the fall of 1985, and indicted him on November 7, 1985. The activities for which Mr. Kortz was indicted occurred February 8, 1985, a full seven months before the end of the grand jury term on September 8, 1985. The prosecutor was undoubtedly aware during the spring grand jury term of Mr. Kortz's drug involvement and of the events of February 8, 1985 which led to his indictment, but failed to present any information about Mr. Kortz to the grand jury during that regular term. I can only speculate about the purpose the prosecutor sought to achieve by his delay; perhaps he wanted to create or accumulate evidence on additional violations and "stack" the charges, or perhaps he wanted to use Mr. Kortz to inculpate additional persons involved in illegal drug activities. In any event, it appears that the grand jury investigation of the defendant was initiated *after* the end of the term of the court for which it was empaneled.

The majority rely on the reasoning that termination of the grand jury's jurisdiction

"* * * in the midst of an uncompleted investigation, thereby compelling the successor grand jury to again enter the same investigation ab initio would disrupt the judicial process, [and] contribute to the law's delays * * *." *State v. McReynolds*, 212 Or. 325, 319 P.2d 904, 906 (1957).

While I do not disagree with that reasoning, it does not apply to the facts of this case because this case does not involve an incomplete continuing investigation. If in this case the grand jury was in the midst of an incompleted investigation of Mr. Kortz's activities, then I would be inclined to look more favorably on their continuing jurisdiction.

I would hold that in order to obtain the continuing jurisdiction of the grand jury over a particular matter of investigation, that matter must at least be presented to the grand jury before the end of the term of court for which it was empaneled, particularly so where, as here, the prosecutor could have presented the information. Case law supports this view.

In the Oregon case quoted by the majority, *State v. McReynolds*, supra, there was a statute in effect and in use for 44 years which authorized a court order to continue the grand jury during as many terms as is deemed advisable. As the majority in this case point out, Wyoming has no such statute. Even so, the reasons for the continuance of the grand jury in that case were " '[t]hat the said grand jury has matters *now under consideration* which cannot be completed by the end of the * * * term of court.' " (Emphasis added.) 319 P.2d at 905. The court ordered that the grand jury be continued over " 'until the matters under investigation and now pending before

---

**4.** Chapter 157, S.L. of Wyoming 1987 completely rewrote the grand jury statutes, and § 7–5–102, W.S.1977, 1987 Replacement, effective May 22, 1987, provides a stated term of one year:

"A grand jury shall be drawn, summoned and impaneled in the same manner as trial juries in civil actions and shall serve for one (1) year following selection unless discharged sooner by the district judge."

With confinement releases by commutation, expiration of sentences, and abolition of the questioned term status of the grand jury, this subject may be academic. Kortz, if released after the expiration of his minimum term, would still have a parole term to serve.

**5.** Adverse community reaction created in large part by the grand jury session afforded an environment for primary election defeat for both the sheriff and prosecuting attorney.

said grand jury are disposed of.'" Id. at 905.

That reasoning is consistent with the overwhelming majority of cases in states which allow the continuation of grand jury activities beyond term. Those states require that the jurisdiction of a grand jury may continue past the term of court only to consider matters which are already pending and under investigation by the grand jury. See, e.g., *People v. Hall*, 16 Ill.2d 223, 157 N.E.2d 26 (1959); *Harrod v. Commonwealth*, Ky., 253 S.W.2d 574 (1952); *Shenker v. Harr*, 332 Pa. 382, 2 A.2d 298 (1938); *State v. Wescott*, 194 Wis. 410, 217 N.W. 283 (1927).

The United States Supreme Court was very clear in its enunciation of the rule as it pertains to federal grand juries:

"* * * [T]he 'investigations' must have been begun during the grand jury's original term and * * * new domains of inquiry may not thereafter be entered by the grand jury." *United States v. Johnson*, 319 U.S. 503, 510, 63 S.Ct. 1233, 1237, 87 L.Ed. 1546, reh. denied 320 U.S. 808, 64 S.Ct. 25, 88 L.Ed. 488 (1943).

That court was interpreting the federal grand jury statute which authorizes grand juries "'to finish investigations begun but not finished by such grand jury' during its original term." 319 U.S. at 508, 63 S.Ct. at 1236, citing 28 U.S.C.A. § 421. Under that federal law, the Supreme Court stated that "to allow a grand jury to sit beyond the term and take up new instead of finishing old business" would be a "legally forbidden act." 319 U.S. at 509–510, 63 S.Ct. at 1236–37.

I believe this court should adopt an approach to the continuing jurisdiction of grand juries which adheres to the reasoning in the cases upon which the majority rely and upon which the federal statute is premised. A grand jury should not be permitted to take up new matters after its term, but should be permitted only to complete those investigations already undertaken during the term. The charging function for indictment was commenced after the expiration of the term, and the resulting indictment was improper. If a grand

jury rather than filed information had been desired, a new appointment would have been required. Obviously Prosecutor Murray did not like the fair-hearing and due-process facets of a preliminary hearing.

It is generally related that intermediate appellate courts decide cases and that supreme courts set standards. I sincerely dissent in this conviction and all aspects of the process used, and question what kind of perverted standard of criminal process and prosecutorial activities this case could condone. Fortunately, subject only to the few persons remaining in custody as a result of the Campbell County episode and consequent postconviction appeal possibility, we can consider this event in adjudicative substance to now be at an end, as the last of the nine appeals involving three reversals, three commutations, and this fourth case which I would conclude to be improvidently affirmed. In ending that episode, this case personifies the worst of that experience from which no segment of our society can take comfort.